Malcolm D. FLAVEL, individually and on behalf of all other persons similarly situated, Group Representative Plaintiff

and

Robert F. Cnare, James R. Conradt, Major Coxhill, Robert K. Elbel, Malcolm D. Flavel (deceased), Russell H. Graff, Robert L. Isferding, Robert E. Jones, Chalasani C. Rayan (deceased), Richard Spoonamore and Ronald J. Weiss, Individual Plaintiffs,

and

The United States Equal Employment Opportunity Commission, Intervenor Plaintiff representing the 11 named plaintiffs above, plus Robert W. Belling, Conrad Heinemann, William D. Meager, Byron K. Smay, and Robert Van Dyke, as additional plaintiffs represented by the United States,

v.

SVEDALA INDUSTRIES, INCORPORATED, and Svedala Incorporated, Defendants.

No. 92–C–1095.

United States District Court, E.D. Wisconsin.

Nov. 10, 1994.

Stephen J. Snyder, David P. Pearson, and Craig A. Brandt, Winthrop & Weinstine, St. Paul, MN, for plaintiffs.

Brian C. Tyndall, Senior Trial Atty., U.S. E.E.O.C., Milwaukee, WI, and Lloyd B. Zimmerman, Senior Trial Atty., U.S. E.E.O.C., Minneapolis, MN, for plaintiff-intervenors.

Steven P. Handler, Daniel J. Donnelly, McDermott, Will & Emery, Chicago, IL, Howard A. Pollack, Godfrey & Kahn, Milwaukee, WI, and John J. Fons, Svedala Industries, Inc., Corporate Counsel, Waukesha, WI, for defendants.

### DECISION AND ORDER

WARREN, District Judge.

Before the Court are the defendants' Motions for Summary Judgment as to (1) the Age Discrimination Claim of Plaintiff Robert Van Dyke, (2) the Age Discrimination Claims of Plaintiffs Ronald Weiss, Malcolm Flavel and Richard Spoonamore, and (3) those Plaintiffs Alleging Constructive Discharge—Byron Smay, William Meagher, Robert Isferding, Robert Jones, Major Coxhill, and James Conradt. For the following reasons, these motions are denied.

## I. FINDINGS OF FACT

### A. PLAINTIFFS RONALD WEISS, MALCOLM FLAVEL, AND RICHARD SPOONAMORE:

The Appleton operation of defendant Svedala Industries, Inc. ("SI") was responsible for the design, engineering, manufacturing and marketing of crushing equipment and screens. (Def.Proposed Findings of Fact ¶ 1.) Crushing equipment takes large mined rocks, some up to eight feet in diameter, and crushes them into small pieces; screens are then used to segregate rock particles by size. (*Id.*)

In April of 1989, William Farnsworth, who had been General Manager of the Appleton facility for many years, retired. (*Id.* at ¶ 2.) Mr. Farnsworth was replaced on November 15, 1989 by William Guernsey, who had been General Manager of Consolidated Diesel, a

joint venture between Cummins Engine Company and J.I. Case. (*Id.* at ¶ 3.)

### 1. *Ronald Weiss:*

When Mr. Guernsey interviewed for the general manager position with officers of Svedala Industri A.B. ("SIAB"), SI's Swedish parent corporation, various shortcomings of the Appleton management team were discussed, including the performance of plaintiff Ronald Weiss, Appleton's Manager of Manufacturing. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 46–47.) Mr. Weiss had started with SI's predecessor, Allis–Chalmers, in 1972, and was employed as the Manager of Manufacturing at Appleton since 1981. (Def.Proposed Findings of Fact ¶ 8.) Each written performance review prepared by Mr. Farnsworth for the five years before Mr. Guernsey was hired rated Mr. Weiss at the second from the top of six rating levels; none mentioned any "improvement needs," and all listed "upper management" or "general management" as Mr. Weiss' "long range career objectives." (Pl.Resp. to Def.Proposed Findings of Fact ¶ 2.) Mr. Weiss received favorable annual performance appraisals every year until 1990; it is disputed whether Mr. Farnsworth ever expressed dissatisfaction to anyone about his performance. (*Id.* at ¶¶ 4–6.) Mr. Farnsworth nominated Mr. Weiss to attend the personnel development center to be conducted by SIAB at Nordic Hills Training Center; Mr. Weiss and all other Appleton nominees over forty (40) years of age were rejected, and only the youngest, Pat Quinn—then age thirty-eight (38)—was invited to attend. (*Id.* at ¶¶ 39–40.) Mr. Farnsworth also recommended Mr. Weiss, along with Jim Gregor or Hugh Foy, as his replacement. (*Id.* at ¶ 38.) The 1989 performance review for Mr. Quinn describes him as a "solid young manager with very high potential," and the 1989 performance review for Mr. Gregor, Appleton's Manager of Sales, lists the "need to develop young generation of salesmen & mgt. candidates" as his improvement needs; the progress review for Mr. Weiss dated February 8, 1990 dropped him from a near-top ranking to the bottom. (*Id.* at ¶ 50.)

According to the defendants, Mr. Guernsey, upon arriving at Appleton, concluded that costs relating to quality control, purchasing, and inventory were too high, and that plant safety was a problem. (Def.Proposed Findings of Fact ¶¶ 10–13; 15, 17). Mr. Guernsey believed that Mr. Weiss did not have in place an adequate safety improvement program, and held him responsible for cost problems. (*Id.* at ¶¶ 14, 16–20.) Under Mr. Weiss' management, the Appleton facility had in place a management safety council, a safety brigade, safety tours, weekly safety programs, safety posters, periodic safety contests, safety awards, and a full-time nurse. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 21.) The plaintiffs also reference Mr. Guernsey's November 8, 1991 deposition testimony, where he stated that the Appleton facility "had a safety record that was average in the industry," and the fact that the manufacturing operation at Appleton under Mr. Weiss' supervision had been rated as outstanding during the last audit of the program in 1987–88. (*Id.* at ¶¶ 12, 14.) Appleton statistics on safety under Mr. Weiss' management were within OSHA requirements. (*Id.* at ¶ 22.)

The defendants indicate that Mr. Guernsey "is a proponent of the managerial philosophy known as Total Quality Management ("TQM")," which espouses teamwork, accountability, and quantifiable performance goals and objectives. (Def.Proposed Findings of Fact ¶¶ 4–5). The plaintiffs indicate that, in connection with the sale of the mineral systems division of Allis–Chalmers, John Platner, SI's North American President, eliminated the total quality assurance department at Appleton as a cost-savings measure, reassigning TQM to the engineering department, and that Mr. Weiss preserved as much of the TQM program in manufacturing as he could. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 15–16.) According to the plaintiffs, Mr. Guernsey never discussed TQM or the safety program at Appleton with Mr. Weiss. (*Id.* at ¶¶ 17–20.)

During the period preceding Mr. Guernsey's arrival at Appleton, Mr. Weiss was working on the largest cost reduction plan that had ever been approved during the eighteen years he had been with the company; he had also received prior approval before

traveling to China in October of 1989 regarding a sourcing castings project. (*Id.* at ¶¶ 28–32.) Inventory levels at Appleton were not set by the manager of manufacturing operations; instead, a formal master scheduling meeting was held each month involving the general manager and his entire staff, with the former granting final approval for the monthly master schedule, including inventory levels. (*Id.* at ¶¶ 33–35.) The manufacturing operations at Appleton under Mr. Weiss produced inventory and other products in accordance with the approved master schedule. (*Id.* at ¶ 36.)

In December of 1989, one month after he had replaced Mr. Farnsworth, Mr. Guernsey decided to remove Mr. Weiss as Manager of Manufacturing. (Def.Proposed Findings of Fact ¶¶ 21, 25.) Mr. Guernsey replaced Mr. Weiss with Gerald Dircks, a forty-nine (49) year old former colleague at Consolidated Diesel familiar with TQM principles. (*Id.* at ¶¶ 22–24, 28–29.) Mr. Dircks was interviewed in December, and his hiring was approved by Mr. Planter and Swedish parent manager Jan Knuttson before Christmas. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 41.) Mr. Guernsey announced Mr. Weiss' impending termination to Mr. Gregor and other SI managers; according to Mr. Gregor, Mr. Guernsey stated that "there could be some legal implications involved in this so none of you is to discuss any of this with anybody." (*Id.* at ¶ 42.) According to Mr. Weiss, Mr. Guernsey stated to him in a January of 1990 conversation that "the problem with Appleton is that we have too many old people in their jobs too long." (*Id.* at ¶ 54.) While he had initially considered placing Mr. Weiss in another position, Mr. Guernsey terminated his employment on February 12, 1990. (Def.Proposed Findings of Fact ¶¶ 26–28.) Mr. Weiss was fifty-four (54) years old when terminated. (*Id.* at ¶ 28.) His final rate card, signed by Mr. Guernsey, has the "retire" box marked as the reason for "separation from force," rather than "term." or "lay off." (Pl.Resp. to Def.Proposed Findings of Fact ¶ 7.)

On November 2, 1990, Mr. Weiss filed an age discrimination charge with the Wisconsin Department of Industry, Labor and Human Relations ("DILHR"). (*Id.* at ¶ 8.) On November 16, 1990, SI, through its General Counsel John Fons, responded to Mr. Weiss' charge, stating that:

> "After his start with Boliden Allis, Inc., Mr. Guernsey reviewed the past and current performance of each manager and, based on Mr. Weiss's performance and willingness to be a team player, determined that Mr. Weiss would not be able to meet his expectations. Rather than insult Mr. Weiss by demoting him, Mr. Guernsey offered Mr. Weiss a severance package which included salary continuation to age 55, enabling Mr. Weiss to then qualify for retiree health benefits."

(*Id.* at ¶ 9.) On January 9, 1991, DILHR made a probable cause finding in favor of Mr. Weiss. (*Id.* at ¶ 10.)

### 2. *Malcolm Flavel:*

Before SI acquired the Appleton unit out of the Allis–Chalmers bankruptcy on January 1, 1988, plaintiff Malcolm Flavel participated in the international marketing of Appleton products, working extensively in the Far East, and was involved in comminution research, the study of how rocks and minerals break up. (Def.Proposed Findings of Fact ¶¶ 30–31.) Shortly before the acquisition, Mr. Platner had rated Mr. Flavel first among the fifteen (15) key employees at Appleton, stating that he "[did not] think there is any way [SI] could replace his knowledge." (Pl. Resp. to Def.Proposed Findings of Fact ¶¶ 63–64.) Mr. Flavel had received significant awards for his work and held mining equipment patents. (*Id.* at ¶ 65.) On October 17, 1990, Mr. Guernsey terminated Mr. Flavel; Mr. Flavel was fifty-four (54) years of age. (*Id.* at ¶ 40; Pl.Resp. to Def.Proposed Findings of Fact ¶ 61.) Mr. Quinn, Mr. Flavel's supervisor at the time of his termination, noted that he "worked hard, was very dedicated and had no performance problems." (*Id.* at ¶ 82.) On September 30, 1992, in response to an administrative charge brought by Mr. Flavel, the EEOC issued a finding of discrimination against SI. (*Id.* at ¶ 57.)

The parties disagree as to the circumstances surrounding Mr. Flavel's dismissal.

According to the defendants, Minco International A.B. ("Minco") was created as the international sales arm for SIAB, representing its products in areas where the latter had no sales or marketing companies. (Def.Proposed Findings of Fact ¶ 33.) They claim that Minco took over Mr. Flavel's responsibilities for marketing Appleton products in the Far East and the Pacific Rim. (*Id.* at ¶ 34.) They also indicate that, in late 1989 and early 1990, funding for comminution research at Appleton was eliminated. (*Id.* at ¶ 35.) Pursuant to these changes, Minco purportedly agreed to split Mr. Flavel's time and expenses with Appleton. (*Id.* at ¶¶ 36–37.) According to the defendants, Mr. Flavel introduced Peter Kohle, president of Minco, and Lars Strom, another Minco employee, to various Pacific Rim contacts; in the fall of 1990, however, Minco discontinued funding for Mr. Flavel's position. (*Id.* at ¶¶ 38–39.) The defendants indicate that, since Mr. Flavel's termination, no one from Appleton has been employed primarily to travel to Asia to sell Appleton products or to engage in comminution research and development. (*Id.* at ¶ 41.)

According to the plaintiffs, when SI initially responded through then Human Resources Manager Paul Stelter to the administrative charge that Mr. Flavel filed with the EEOC, no mention was made of international sales or Minco; instead, SI stated:

> "Specifically, Mr. Flavel was employed by the Allis–Chalmers Corporation (A–C) as a Consultant, Comminution Systems. His was a "one of a kind" research oriented position which, simply put, studied how rocks fractured. In 1988 certain assets of A–C were purchased, including the Appleton operation which produces rock crushing equipment and remains part of an international corporation. Since that time, the basic research and development of our *rock crushing machinery has been done in* Sweden. Over the last several years it became apparent that we had no work for Mr. Flavel, within his area of expertise."

(Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 56, 67.) The plaintiffs indicate that Mr. Flavel's immediate supervisor when he was terminated was Mr. Quinn, who told Mr. Weiss in late 1989 that Ted Thomas, then age thirty-three (33), would be given additional responsibility in the comminution area. (*Id.* at ¶¶ 66, 70.)

Mr. Quinn also purportedly admitted that the departure of another comminution consultant, Hugh Rimmer, in May of 1990 had created an open position for an application engineer at the company. (*Id.* at ¶¶ 58–59.) According to the plaintiffs, Mr. Quinn admitted that Mr. Flavel was fully qualified to perform such duties; however, instead of offering him the position, SI first offered the job to Joe Pirozzoli, who was younger than Mr. Flavel, and then hired David Urbanek, age twenty-eight (28), on April 1, 1991. (*Id.* at ¶¶ 60–62.) The plaintiffs also indicate that, since Mr. Flavel's termination, Mr. Thomas has traveled to China in connection with sales at the Anshan mining project, on which Mr. Flavel had previously been working, and to other countries. (*Id.* at ¶ 69.)

Finally, the plaintiffs note that during 1990, when Minco had supposedly rejected Mr. Flavel as a participant in its international sales efforts, it was advertising for an open sales position for Latin America; the job requirements stated that applicants be "between 30 and 40, with a background in business and engineering, preferably with a degree from a college or institute of technology." (*Id.* at ¶¶ 71–72.) Mr. Flavel's international sales experience included Latin America; however, Minco hired Ed Pronk, then age thirty-three (33). (*Id.* at ¶¶ 73–75.) In making this decision, the plaintiffs claim that Mr. Stelter and Mr. Quinn were influenced by a fax received from Minco which stated that the ideal candidate's age would be in the 30's; in a June 20, 1990 letter from Mr. Stelter to Mr. Guernsey recommending a termination arrangement for Mr. Flavel, Mr. Stelter noted in the first paragraph that "Mal was born May 8, 1936 and is 54 years old." (*Id.* at ¶ 79.)

### 3. *Richard Spoonamore:*

Plaintiff Richard Spoonamore, whose date of birth is May 11, 1935, was hired by Allis–Chalmers, SI's predecessor, in July of 1979 as a field service representative. (Def.Proposed Findings of Fact ¶ 42; Pl.Resp. to Def.Proposed Findings of Fact ¶ 84.) Mr.

Spoonamore was based in Tucson, Arizona, and travelled both internationally and domestically approximately sixty (60) percent of the time. (*Id.* at ¶ 85.) Mr. Spoonamore continued in this capacity when SI purchased the Appleton business on January 1, 1988, reporting to James Gregor, national sales manager for the Appleton facility. (*Id.* at ¶ 86.) Mr. Spoonamore had technical, sales, and managerial experience with other firms involved in the mining and construction industries, had a bachelor of science degree in mechanical engineering, and had received a certificate in quality control courses from the American Society of Quality Control. (*Id.* at ¶ 92.)

In late March or early April of 1990, at the recommendation of Mr. Gregor, Mr. Spoonamore was promoted to manager of the field service department at Appleton; he relocated to Appleton while his family remained in Arizona, and continued to report to Mr. Gregor. (*Id.* at ¶¶ 87–88, 93; Def.Proposed Findings of Fact ¶ 43.) While unhappy with SI's first-year salary offer of $43,200, Mr. Spoonamore agreed to accept the position, noting his desire to have his salary reviewed within one year. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 90–91.)

One of Mr. Spoonamore's duties as manager of field service was to coordinate the activities of the field service representatives. (*Id.* at ¶¶ 94–95.) According to plaintiffs, however, his ability to perform this task was "seriously undermined" by Mr. Guernsey, Mr. Quinn, and Mr. Dircks, who "routinely" contacted field service representatives directly, ordered them to perform field service work without notifying Mr. Spoonamore, and "verbally abused [Mr. Spoonamore] in a very severe fashion in front of others." (*Id.* at ¶¶ 95–97.) The plaintiffs also indicate that Mr. Spoonamore's attempts to hire a Warranty Administrator and to obtain a computer system for his department to improve performance were "denied without any explanation"; his request for a training room was also delayed. (*Id.* at ¶¶ 98–104.) Mr. Spoonamore also recommended that additional field service representatives be hired to cover increasing workloads; he was told, however, that he could not hire any additional persons because they "weren't in the budget." (*Id.* at ¶ 105.)

The plaintiffs indicate that, within several months after coming to Appleton, Mr. Spoonamore, through Mr. Gregor and other employees, discovered that Mr. Guernsey was upset with Mr. Gregor for promoting him because he was "too old," "younger people [ ] could take his job," and "he had this young, professional-type guy waiting in the wings who could just step right in and hit the road running." (*Id.* at ¶¶ 107–109.) Later in 1990, Mr. Gregor told Mr. Spoonamore that, despite his satisfaction with Mr. Spoonamore's performance, Mr. Guernsey had told him that Joe Quinn and William Meagher, two salesmen for the Appleton business, were also "too old," that he had "lumped [them] all together," and that Mr. Gregor had to "get rid of you guys." (*Id.* at ¶¶ 110–113.) In August of 1990, Appleton parts manager Gary Wichtel purportedly told Mr. Spoonamore that Mr. Guernsey was not happy with him and other field representatives because of their age, and that he was glad that the people in the parts department were young. (*Id.* at ¶¶ 114–115.)

In 1990, Appleton employees, including managers, were scheduled to attend classes in TQM principles taught at Fox Valley Institute, located three miles from SI's Appleton facility. (Def.Proposed Findings of Fact ¶ 44.) According to the defendants, Mr. Spoonamore was critical of TQM philosophy, calling it "hogwash," as well as the TQM consultant retained to teach the Fox Valley classes, and his attendance at the classes was "sporadic." (*Id.* at ¶¶ 45–47.) The plaintiffs, however, indicate that Mr. Spoonamore merely expressed doubts about the applicability of certain specific management strategies to his small department, that he is conversant with TQM principles and believes they can be effective in assisting businesses like Appleton, and that Mr. Guernsey never discussed TQM principles with Mr. Spoonamore. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 173, 175–177.) Moreover, they claim that his "sporadic" attendance only resulted from instructions by Mr. Guernsey and Mr. Stelter that business service, including an-

swering phones, should take priority over course attendance. (*Id.* at ¶ 178.)

In late December of 1990 or early January of 1991, Mr. Spoonamore purportedly recommended to Mr. Gregor that each of the field service representatives in his department receive substantial raises in their annual salaries; at that time, two were under age forty (40), Steve Cadieux and Ron Monfils, and two were over age forty (40), Scott Hiller and Al Peterson. (*Id.* at ¶ 119.) Mr. Guernsey endorsed Mr. Spoonamore's recommendation for the two younger employees, approving substantial raises, but overruled his recommendation as to the two older employees, approving only token raises. (*Id.*) Mr. Peterson had begun employment with SI five years after Mr. Monfils and three years after Mr. Cadieux; in 1990, Mr. Hiller received a substantially higher salary than the others, and in 1991 Mr. Peterson received a substantial raise. (Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 119.)

Mr. Spoonamore expected to receive a pay increase effective April 1, 1991; when he received his April 15, 1991 paycheck, however, he realized that Mr. Guernsey had not approved a raise in salary. (Def.Proposed Findings of Fact ¶ 48; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 120, 125.) Mr. Guernsey had never conducted a performance review of Mr. Spoonamore, articulated to Mr. Spoonamore concerns about his performance, or provided written notice of alleged performance deficiencies. (*Id.* at ¶ 126.) The defendants attribute the raise denial to Mr. Spoonamore's "resistance to Guernsey's TQM management philosophy, as well as other problems Guernsey perceived with his performance." (Def.Proposed Findings of Fact ¶ 48.) On April 16, 1991, Mr. Spoonamore hand-delivered to Mr. Gregor a letter of resignation from his management position; in his letter and in a conversation with Mr. Gregor, he noted that he hoped to return to Tucson to "serve [the company] well in the Field Service Representative function," that he would assist his managerial successor during transition, and that he was upset over being denied a raise despite his satisfactory performance. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 121–123.)

Mr. Gregor and his immediate supervisor, Joe Valitchka, had a conversation regarding Mr. Spoonamore's desired raise; in late April or early May of 1991, Mr. Spoonamore also spoke with Mr. Valitchka, telling him that he would have to return to Arizona if his salary in Appleton were not adjusted. (*Id.* at ¶¶ 124, 127; Def.Proposed Findings of Fact ¶¶ 50–51.)

On Memorial Day weekend of 1991, Mr. Spoonamore packed up his personal belongings and moved from Appleton to Tucson; it is not clear whether he had previously notified Mr. Gregor of his intention to do so. (*Id.* at ¶¶ 52–53; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 130–131; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 130.) The following Tuesday, Mr. Gregor called Mr. Spoonamore in Tucson, and Mr. Spoonamore agreed to return to Appleton, at SI's expense, to assist in the transfer of his former job as manager of field service; it is not clear whether Mr. Spoonamore was offered a position as a field representative. (Def.Proposed Findings of Fact ¶¶ 54–57; Pl. Resp. to Def.Proposed Findings of Fact ¶¶ 132–135.) During the next week in Appleton, at the request of Mr. Valitchka, Mr. Spoonamore compiled information relating to the costs to be incurred in "starting up" unused equipment sold by SI several years earlier to a Mexican customer; some time earlier, he had estimated the total start-up cost at $50,000, or twice that originally anticipated by SI. (*Id.* at ¶¶ 136–144; Def.Proposed Findings of Fact ¶¶ 58–68.) Mr. Guernsey and Mr. Spoonamore had met in January or February of 1991 about this estimate; while the defendants claim that Mr. Guernsey limited Mr. Spoonamore to spending $40,000 on such costs, (*Id.* at ¶¶ 67–68), the plaintiffs indicate that Mr. Spoonamore was informed by Mr. Gregor that Mr. Guernsey authorized completion of the start-up, without use of Appleton employees, even if expenses approached $70,000. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 145–148.) The start-up of the equipment in Mexico was completed by Memorial Day of 1991 at a cost of over $67,000. (*Id.* at ¶¶ 153–154.)

Before completion of the start-up project, Mr. Spoonamore sent a letter to the Mexican

customer advising them of the updated cost figures, acknowledging the contract terms calling for $25,260 in start-up charges, and indicating that he would advise them if "costs exceed[ed] the contract figure so [they] will know of any back charges, to expect from the office." (*Id.* at ¶¶ 151–152.) In early June of 1991, after Mr. Spoonamore had returned to Appleton, Mr. Guernsey was informed of the total actual cost expended on the project, approximately $67,000; the defendants indicate that Mr. Guernsey was "extremely upset at Spoonamore's disobeying his directive on the costs relating to the" project. (Def.Proposed Findings of Fact ¶ 71.) Mr. Gregor, however, testified that he "emphatically" believes that Mr. Spoonamore did not "go beyond his authority" in connection with the project. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 149.) SI sought cost recovery from the equipment purchaser; ultimately, the parties reached a $60,000 settlement. (*Id.* at ¶¶ 154–155.)

On Friday of that week, Mr. Spoonamore's employment was terminated in a meeting with Mr. Valitchka and Mr. Stelter. (*Id.* at ¶¶ 157–159; Def.Proposed Findings of Fact ¶ 72.) At this meeting, either Mr. Valitchka or Mr. Stelter stated that Mr. Spoonamore's "resignation was being accepted"; Mr. Spoonamore insists that he never voluntarily resigned. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 159–160, 162–163; Def. Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 160.) According to the plaintiffs, at the request of Mr. Valitchka and Mr. Stelter, Mr. Spoonamore granted permission for his briefcase and rented vehicle to be searched before leaving. (Pl.Resp. to Del.Proposed Findings of Fact ¶ 161.) According to the plaintiffs, Mr. Spoonamore was never told that he was being terminated because of his purported resistance to TQM principles espoused by Mr. Guernsey. (*Id.* at ¶ 174.)

Mr. Spoonamore filed an unemployment compensation claim in Arizona; on February 19, 1992, an Appeals Board of the Arizona Department of Economic Security found that Mr. Spoonamore "did not express an intention to quit working entirely for the company," and that, when SI told him on May 28, 1991 that "he would be paid field service pay at his old rate, [it] had accepted [his] resignation from the position of manager of field service and had accepted [his] request to be hired as a field service representative." (*Id.* at ¶¶ 163–164.) This finding was affirmed on April 20, 1992 by the Arizona Appeals Board. (*Id.* at ¶ 165.) On July 24, 1991, Mr. Spoonamore filed an age discrimination charge with the EEOC, specifically referencing purported ageist statements made by Mr. Guernsey. (*Id.* at ¶ 182.) In October of 1992, the EEOC issued a Letter of Violation against SI, concluding that they "exercised a preference for younger employees and that preference had its origins with Swedish corporate affiliates," that Mr. Guernsey had "expressed and exercised a preference regarding the retention and promotion of younger staff," and that there was "substantial evidence" of a "campaign of harassment of older employees at the Appleton facility." (*Id.* at ¶ 184.)

**B. *PLAINTIFF ROBERT VAN DYKE*:**

The Standard Steel Corporation of Los Angeles, California was acquired by Allis–Chalmers in the early 1970's and renamed Stansteel. (Def.Proposed Findings of Fact ¶¶ 7–8.) On January 1, 1988, as part of its acquisition of the Milwaukee unit of Allis–Chalmers, SI acquired the Stansteel operation. (*Id.* at ¶¶ 1–9.) Plaintiff Robert Van Dyke joined Standard Steel in 1966 and performed duties relating to export sales and licensing programs. (*Id.* at ¶ 10.) At that time, Standard Steel employed approximately 400–500 employees. (*Id.* at ¶ 11.) Due to declining business, that number decreased to approximately 300–400 by 1977. (*Id.* at ¶ 12.) In 1977, Mr. Van Dyke, by then the sales administration manager for Stansteel, was terminated as part of a reduction in force caused by the closing of Stansteel's manufacturing facility; approximately forty (40) people were retained to perform non-manufacturing tasks. (*Id.* at ¶¶ 13–14.) Mr. Van Dyke was rehired by Stansteel in 1979, and became the on-site manager in 1984; at that time, Stansteel employed approximately thirty (30) people. (*Id.* at ¶¶ 1, 15–17.) As manager, Mr. Van Dyke was responsible for overseeing the entire business group including engineering, parts sales, quality assur-

ance, sales, contract administration and field service. (*Id.* at ¶ 18.)

The Vice–President and General Manager of SI's Milwaukee facility is Dr. Ki Joung. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 7.) Mr. Van Dyke reported directly to Dr. Joung from January 1 to November 30, 1988, when he began reporting to Bobby Faulkner, manager of the product and processes area of the "Minerals Systems Company" at the Milwaukee facility. (*Id.* at ¶ 8.) In November of 1988, a further reduction of the Stansteel work force took place; the parties dispute whether it resulted from declining sales and whether Mr. Faulkner participated in termination decisions. (*Id.* at ¶¶ 21–22, 26; Def.Proposed Findings of Fact ¶ 19.) Several employees were discharged and responsibility for purchasing, quality assurance, field service, invoicing, accounting, engineering, parts sales, and contract administration were transferred to Milwaukee. (*Id.* at ¶ 20; Pl. Resp. to Def.Proposed Findings of Fact ¶ 9.) According to the plaintiffs, Mr. Faulkner assumed responsibility for one of Mr. Van Dyke's normal managerial duties: resolving holdbacks on certain equipment contracts. (*Id.* at ¶ 10.) The defendants, however, contend that Mr. Faulkner so acted only after receiving customer complaints and determining that Stansteel's outstanding holdbacks were inappropriately high. (Def.Proposed Findings of Fact ¶¶ 23–24; Def.Reply to Pl. Resp. to Def.Proposed Findings of Fact ¶ 10.) The plaintiffs indicate that Mr. Van Dyke was not consulted in any way prior to making these changes; according to the defendants, however, Dr. Joung and Mr. Faulkner advised Mr. Van Dyke about these and other concerns throughout 1989. (Def.Proposed Findings of Fact ¶ 25; Pl.Resp. to Def.Proposed Findings of Fact ¶ 24.) After the November of 1988 reduction-in-force, six employees remained at Stansteel—Mr. Van Dyke, Ed Simonian, Edward (Craig) Turner, Mary Ham, Bernice Wingerson, and Santiago (Jim) Rodriguez. (Def.Proposed Findings of Fact ¶ 22.) Stansteel also retained three former employees, Marcus Rouchaud, Roy Heacock, and Warren Vetter, as consultants. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 27.)

According to the defendants, the Stansteel operation "continued to show disappointing results during 1989." (Def.Proposed Findings of Fact ¶ 26.) Nevertheless, in August of 1989, Mr. Faulkner authorized a 7.1% merit pay increase for Mr. Van Dyke, which was approved in writing by Dr. Joung. (Pl. Resp. to Def.Proposed Findings of Fact ¶ 13.) The defendants claim that, at the end of 1989, Mr. Faulkner and Dr. Joung decided to further consolidate the Stansteel operation with the Milwaukee unit, determining that an on-site manager was not needed at Stansteel because Mr. Faulkner could supervise the operation from Milwaukee. (Def.Proposed Findings of Fact ¶¶ 27–28.) They indicate that this, plus Mr. Faulkner's concerns about Mr. Van Dyke's performance, resulted in a decision to terminate Mr. Van Dyke; they claim that his age was never discussed. (*Id.* at ¶¶ 29–31.) While the plaintiffs indicate that neither Dr. Joung nor Mr. Faulkner had ever questioned Mr. Van Dyke's performance in any way, the defendants claim that Mr. Faulkner discussed with Mr. Van Dyke his concerns regarding customer complaints and performance. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 14, 23, 28; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 28.)

Mr. Van Dyke did not receive any performance appraisals as manager of Stansteel after approximately 1984. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 29.) However, in a confidential memo to Mr. Planter pertaining to incentive compensation for Dr. Joung's first reports, Dr. Joung placed Mr. Van Dyke ahead of Mr. Faulkner in his list of incentive compensation candidates. (*Id.* at ¶ 17.)

On January 9, 1990, Mr. Faulkner travelled to Stansteel to terminate Mr. Van Dyke; according to the plaintiffs, he made no mention of any performance problems, instead handing Mr. Van Dyke a termination letter citing restructuring as the cause for elimination of his position. (*Id.* at ¶¶ 15–16, 32–33, 36.) Mr. Van Dyke's age was not discussed during the termination meeting. (Def.Proposed Findings of Fact ¶ 35.) Mr. Van Dyke was sixty-one (61) when he was terminated. (*Id.* at ¶ 37.) The parties agree

that it was Dr. Joung's decision to discharge Mr. Van Dyke. (*Id.* at ¶ 31; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 31.) After Mr. Van Dyke was terminated, four employees remained at Stansteel—Mr. Simonian, age fifty-five (55); Mr. Turner, age fifty-three (53); Ms. Hamm, age fifty-two (52); and Mr. Wingerson, age fifty-three (53). (Pl.Resp. to Def.Proposed Findings of Fact ¶ 38.) Mr. Van Dyke believes that Stansteel should have terminated Mr. Turner in its restructuring, as specific performance deficiencies had been identified regarding Mr. Turner and Mr. Faulkner had been advised by Mr. Van Dyke that he was unhappy with his performance; the defendants, however, stress that Mr. Van Dyke did not "take any action" against Mr. Turner "even though he was his manager for several years." (*Id.* at ¶¶ 37–38; Def.Proposed Findings of Fact ¶¶ 39–40.) As of January of 1990, Mr. Faulkner was aware of co-workers' complaints about Mr. Turner; as part of the February 1991 reduction-in-force at the Milwaukee facility, Mr. Turner was placed on probation and told that he had to focus on his job duties in order to maintain his employment. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 41–42.)

In a set of notes pertaining to the business objectives of the Mineral Systems Company which predated Mr. Van Dyke's termination, Dr. Joung expressed concern that the engineering and sales personnel at Stansteel were too old. (*Id.* at ¶ 18.) In a report to the Swedish parent corporation of SI in October of 1989, Dr. Joung noted that "[t]he average age of BA/Milwaukee employees is quite high ... [t]herefore, we initiated a program in 1989, in which the positions vacated by either retirement or departure were filled with younger people as much as possible." (*Id.* at ¶ 19.) According to the plaintiffs, Dr. Joung called Mr. Van Dyke from time to time to discuss the age of his staff, which Dr. Joung said was "up in age," and suggested that Mr. Van Dyke hire younger people to replace Stansteel personnel. (*Id.* at ¶ 20.) Mr. Van Dyke also contends that Stansteel had a reasonable backlog of business when he was terminated, and good prospects for future business; the defendants dispute this claim. (*Id.* at ¶ 25; Def.Reply to

Pl.Resp. to Def.Proposed Findings of Fact ¶ 25.) Mr. Van Dyke believes that he had more experience with Stansteel's products than Mr. Turner, and that a manager was still needed on site at the Stansteel operation when he was terminated. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 45.)

Mr. Van Dyke never filed an age discrimination charge with the EEOC. (Def.Proposed Findings of Fact ¶ 42.) He did not become involved in this action until he was contacted by the EEOC in late 1993. (*Id.* at ¶ 43.)

### C. PLAINTIFFS ALLEGING CONSTRUCTIVE DISCHARGE:

Six plaintiffs allege that they were constructively discharged; Byron Smay, William Meagher, Robert Isferding, Robert Jones, James Conradt, and Major Coxhill. (Def.Proposed Findings of Fact ¶ 1.) Each was employed at the Appleton unit, which was responsible for the design, engineering, manufacturing, and marketing of crushing equipment and screens. (*Id.* at ¶¶ 2, 3.)

In their voluminous submissions, the plaintiffs present the following facts as evidence demonstrating a pattern or practice of age discrimination by the defendants. Thomas Older, the president of SIAB, and other Swedish managers have been corporate directors of the defendants since SIAB purchased Allis–Chalmers' assets in early 1988. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 3.) The interlocking management relationship between SIAB and the Appleton and Milwaukee units involve direct, frequent and substantive communication between senior Swedish management and senior American management. (*Id.* at ¶¶ 4, 7.) Business consolidations, staff reorganizations and realignments, business plans and other significant business issues confronting the American subsidiaries are submitted to SIAB for consideration and approval by senior Swedish management. (*Id.* at ¶ 7.) After the January 1, 1988 acquisition of the solids processing business of Allis–Chalmers, Swedish senior management put in place an annual budget review process, conducted in Sweden, to which each of the general managers for the

United States facilities was "summoned to attend." (*Id.* at ¶ 5.) On a regular basis, and at least annually, Mr. Guernsey and Dr. Joung submitted detailed business plans or reports for consideration and approval by SIAB. (*Id.* at ¶ 6.) Mr. Older, Jan Knuttson, and other senior Swedish managers traveled on a regular basis to the United States to discuss business planning issues with American management. (*Id.* at ¶¶ 6–7.) The Appleton unit submitted detailed financial reports, called "C–Reports," to SIAB on a monthly basis. (*Id.* at ¶ 6.)

The parties dispute whether the SIAB's involvement in the management of the Appleton and Milwaukee units extended to employment policies and decisions, and whether SIAB has been involved in key management and employment policy decisions at the American subsidiaries. (*Id.* at ¶¶ 8–9, 12; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 8–9, 12.) When Mr. Guernsey was being interviewed in Sweden by Mr. Older and Mr. Knuttson for the general manager position at Appleton, he discussed specific personnel in Appleton, including Mr. Weiss. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 11.) Mr. Planter was also directly involved in employment decisions and in the formulation of employment policies at the American subsidiaries; the parties dispute whether he was aware of and approved of the termination and/or demotion "of numerous senior and mid-level managers both at the Appleton and Milwaukee Units." (*Id.* at ¶ 13.) As to the Milwaukee terminations which occurred on February 13, 1991, it was Mr. Planter who first met with Wayne Clark from Clark and Kevin to seek personnel consulting services in connection with the terminations; Mr. Clark's handwritten notes reflect that the topic of age was discussed in this meeting. (*Id.* at ¶ 14.)

According to the plaintiffs, both Dr. Joung and Mr. Soriano, another senior manager at the Milwaukee unit, after returning from a conference for senior managers of SI in Sweden, reported that Swedish management was concerned about the high average age of the workforce at the Milwaukee facility, and wanted action taken to bring in younger workers; Swedish management purportedly stated that the Milwaukee unit had an "age problem." (*Id.* at ¶¶ 15–16.) Mr. Soriano also allegedly stated that, while SIAB management believed that Milwaukee had a problem with older workers, it found the "age problem" at Appleton to be even worse. (*Id.* at ¶ 17.) The written business plan submitted to SIAB by Dr. Joung on October 1, 1988 noted the "high average age" of SI's employees as a "principle weakness." (*Id.* at ¶ 18.) In his annual business plan for 1990–91, which was also submitted to senior management at SIAB, Dr. Joung reported that the average age of employees at the Milwaukee unit was still high and that a program had been initiated to fill positions with younger people, which had decreased the average age of employees. (*Id.* at ¶¶ 19–20.) On November 3, 1989, in a written response to questions raised by Mr. Older during the budget review process, Dr. Joung noted that the $7,000 annual salary differential between American and Canadian employees was due to "age, experience, and project and process related expertise and experience." (*Id.* at ¶ 21.) Mr. Older acknowledges that he and Dr. Joung discussed the "high average age" problem. (*Id.* at ¶¶ 22–23.)

Plaintiff James Conradt had worked in the human resources area of the Appleton unit for approximately eighteen (18) years and had been the manager of human resources for four years prior to the end of his employment in May of 1990; he observed employment policies and practices at SI in 1989 which, in his opinion, indicated that SI and senior management at the Appleton facility were implementing a policy of age discrimination against older workers. (*Id.* at ¶¶ 24–26.) Bruce Merten was the manager of human resources for the Milwaukee unit and the manager for human resources at the corporate level for SI in the United States at the time of their acquisition by SIAB. (*Id.* at ¶¶ 27–29.) On several occasions in or about the spring and summer of 1989, Mr. Conradt and Mr. Merten discussed SI's employment practices and their mutual concern that, based on a "youth cult" being imposed by SIAB management, SI management favored younger employees and discriminated against older workers. (*Id.* at ¶¶ 30–33.) Mr. Conradt claims that he was told by Mr.

Merten that SI had a policy which favored younger workers and discriminated against older employees. (*Id.* at ¶ 33.)

When Mr. Farnsworth retired as general manager at Appleton in April of 1989, senior management at SIAB and the American subsidiaries sought a replacement; Mr. Merten indicated "off the record" to Mr. Conradt that a particular applicant had been rejected because he was "too old." (*Id.* at ¶¶ 35–36.) Mr. Gregor, age forty-five (45) and the general sales manager for the Appleton unit in 1989, was recommended for the position by Mr. Knuttson. (*Id.* at ¶¶ 37–39.) Mr. Gregor traveled to Sweden in early March of 1989 to interview with senior executives of SIAB, including the manager for corporate human resources, who told him that SI was "looking for a guy in his late 30's." (*Id.* at ¶¶ 40–41.)[1] Mr. Gregor was also interviewed by Mr. Older, who, *inter alia,* emphasized the many accomplishments he had achieved at a young age and commented about the young ages of other senior executives at SIAB. (*Id.* at ¶¶ 44–45.) In Mr. Gregor's opinion, he was not given the promotion because he was viewed as too old. (*Id.* at ¶ 46.)

Neither Mr. Weiss and Mr. Foy, ages fifty-four (54) and forty-eight (48), respectively, both of whom had been recommended as replacements by Mr. Farnsworth, were promoted to general manager. (*Id.* at ¶¶ 47–48.) SI retained a professional executive search firm, Erwin & Associates, in conjunction with its search for a new general manager at Appleton; Mr. Planter and Mr. Knuttson met with Ron Erwin, informing him that (1) the Appleton business had been populated by "people who had been in the business 30 years or more, and the message was we need to get new and different thinking and leadership that in looking toward the future that isn't just a prologue to the past," and (2) in conducting the general manager search, the managers of the Swedish parent company wanted to avoid "calcified" candidates, which Mr. Erwin considered to mean people who were "resistant to change" or who lacked "adaptability." (*Id.* at ¶¶ 49–53.) Mr. Erwin

formally recommended ten candidates to Mr. Planter for the position, and his written reports noted each candidate's age: 51, 49, 44, 49, 42, 39, 39, 45, 42, and 37. (*Id.* at ¶ 55.) The last candidate, Mr. Guernsey, was hired for the position; while SIAB management received copies of each candidate's resume, the parties dispute whether senior SIAB managers made the final hiring decision. (*Id.* at ¶¶ 56–60; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 58.)

Shortly after Mr. Guernsey began employment in early November of 1989, he met with SIAB management to discuss business objectives, planning, personnel issues and related matters. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 62–63.) Mr. Guernsey was in regular and direct communication with senior SIAB executives and submitted regular and detailed reports to SIAB regarding the Appleton facility; he also consulted with and reviewed personnel decisions with Mr. Planter. (*Id.* at ¶¶ 64–65.)

Mr. Conradt claims that, within the first five months of Mr. Guernsey's tenure, he observed events exhibiting discriminatory policies on the part of SI and the Appleton unit. (*Id.* at ¶ 66.) In or about the summer of 1989, Mr. Gregor told Mr. Conradt that he had been denied the general manager's position because he was too old and because SIAB management wanted a younger person. (*Id.* at ¶ 67.) In or about the fall of 1989, Mr. Conradt was asked by Mr. Merten to calculate the average age of salaried employees at the Appleton facility; Mr. Conradt was concerned that this request was part of an overall program to get rid of older workers. (*Id.* at ¶ 68.) As he had done in prior years, Mr. Conradt compiled a list of employees sixty (60) years of age or older, which he submitted to Mr. Guernsey in December of 1989. (*Id.* at ¶¶ 69–71.) After receiving the list, Mr. Guernsey purportedly told Mr. Conradt that "[w]e've got an awful lot of long service employees. We need to get some young— ah, new blood into the organization." (*Id.* at ¶ 73.) In January of 1990, Mr. Guernsey

---

1. An April 18, 1990 memorandum to Swedish personnel manager Lars Reverman similarly listed a preferred age range of "late 30's or early 40's" for the replacement for the general manag-

er of Boliden Allis UK, Ltd., a British subsidiary of SIAB. (Pl.Resp. to Def. Proposed Findings of Fact ¶ 61.)

purportedly stated to Mr. Weiss that "[t]he problem with Appleton is that we have too many old people in their jobs too long." (*Id.* at ¶ 74.) Mr. Conradt reported Mr. Guernsey's statements to Mr. Merten, who responded that Mr. Guernsey's view regarding older employees was standard procedure for SI. (*Id.* at ¶ 77.)

In December of 1989, SI held a management assessment conference at the Nordic Hills Conference Center near Chicago, Illinois. (*Id.* at ¶ 78.) In preparation for the conference, SIAB management instructed managers of the manufacturing facilities to select candidates for the conference and to provide Swedish management with biographical information, including age. (*Id.* at ¶ 79.) Mr. Farnsworth submitted the names of four candidates, including Mr. Weiss and Mr. Foy, and their biographical information; only the youngest candidate, Mr. Quinn, who was in his thirties, was selected to attend by Swedish management. (*Id.* at ¶¶ 80–81, 83.) The only information submitted to Swedish management was the nominees' job location, name, present title and age; all those selected to attend were in their thirties and forties, and all candidates in their fifties were rejected. (*Id.* at ¶ 82.)

In or about February of 1990, Mr. Conradt became aware that SI intended to terminate Mr. Weiss. (*Id.* at ¶ 85.) Mr. Conradt felt that Mr. Weiss had been an excellent performer and had not been subject to any negative performance reviews justifying termination. (*Id.* at ¶ 88.) When Mr. Conradt objected to Mr. Guernsey that Mr. Weiss' termination would be a mistake, Mr. Guernsey purportedly told him that he had "two choices, [ ] do as I tell you or there is the door." (*Id.* at ¶ 91.) According to Mr. Conradt, he feared that age discrimination would be directed at him for raising such objections, and he felt that he had no choice but to resign. (*Id.* at ¶¶ 92–93.)

On or about February 8, 1990, Mr. Guernsey conducted his first performance review of Mr. Gregor, establishing written performance objectives including the development of a "young generation of salesmen and manager candidates." (*Id.* at ¶¶ 94, 96–99.) During their meeting, Mr. Guernsey told Mr. Gregor that (1) he had calculated the average age of the sales force at Appleton to be 55–56 years old, (2) the average age was too high in his opinion, (3) they needed to hire a younger and more aggressive sales force, (4) the sales staff was "old and stale," and (5) he was not comfortable working with such an "old" group of employees. (*Id.* at ¶ 100.) The parties dispute whether Mr. Platner played any role in establishing any performance objectives. (*Id.* at ¶¶ 95–96; Def.Reply to Pl. Resp. to Def.Proposed Findings of Fact ¶¶ 95–96.) Mr. Guernsey purportedly repeated these sentiments to Mr. Gregor in the months following this meeting, informing Mr. Gregor that, if he could not get rid of those people, Mr. Guernsey would instruct Mr. Stelter to do so. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 104–106.) On a number of occasions, Mr. Guernsey ordered Mr. Gregor to terminate Mr. Meagher, a salesman in the Florida region who was in his sixties and who Mr. Guernsey referred to as the "old incompetent in Florida"; he wanted to replace Mr. Meagher with some "young blood." (*Id.* at ¶ 107.)

In or about July of 1990, Mr. Guernsey conducted a mid-year performance review of Mr. Gregor, reminding him of his performance objective to develop a younger generation of salesmen and management candidates. (*Id.* at ¶¶ 113–114.) Mr. Gregor objected, telling Mr. Guernsey that, in his opinion, the older salesmen were doing a good job. (*Id.* at ¶ 127.) During that review, Mr. Guernsey criticized Mr. Gregor's decision to promote Mr. Spoonamore, noting that he had a better candidate who was a "very young, professional guy." (*Id.* at ¶¶ 115–116.) Approximately eleven (11) months later, Mr. Spoonamore was terminated. (*Id.* at ¶ 151.) As previously discussed, Mr. Guernsey and Mr. Gregor dispute the reasons for Mr. Spoonamore's termination. (*Id.* at ¶¶ 152–153.) Mr. Gregor felt that Mr. Guernsey was "fixated" on age as an employment criterion. (*Id.* at ¶ 117.)

Shortly after starting as sales and marketing manager for the Appleton facility in April of 1991, Mr. Valitchka indicated to Mr. Gregor that SI's program was to reduce the average age of its sales force by bringing in

younger employees. (*Id.* at ¶¶ 120–123.) That same month, a meeting was held in the engineering conference room with Mr. Guernsey, Mr. Quinn, Mr. Gregor and several other employees. After Mr. Gregor noticed some old pictures of equipment on the wall and stated to Mr. Quinn that "you've got some real antiques there," Mr. Guernsey responded "Oh, I thought you were referring to Pat [Quinn's] people." (*Id.* at ¶ 124.)

After Mr. Quinn, age 39, replaced Mr. Coxhill, age 60, as manager of engineering, Mr. Gregor and other managers observed him verbally abuse, intimidate, unfairly criticize, yell obscenities, and humiliate older workers, including Mr. Flavel, Mr. Isferding, Mr. Jones, and others. (*Id.* at ¶¶ 132–133.) Several employees, some at senior management positions, complained about the age discrimination and the harassment of older workers that was occurring at Svedala. (*Id.* at ¶ 134.) Mr. Foy, the controller of the Appleton facility, learned of Mr. Quinn's behavior and, after discussing it with Mr. Gregor, reported it to Mr. Guernsey. (*Id.* at ¶¶ 135–136.) Mr. Gregor also complained to Mr. Fons, general counsel for SI, and Mr. Stelter about age discrimination and harassment directed towards him and SI salesmen, including harassment and abuse being carried out by senior management at Appleton, including Mr. Guernsey and Mr. Valitchka. (*Id.* at ¶¶ 137–138.) After voicing his complaints, Mr. Gregor perceived that discrimination and harassment against him and others intensified. (*Id.* at ¶ 140.)

Mr. Gregor filed a charge of age discrimination with the EEOC in late June of 1991. (*Id.* at ¶ 142.) Several days thereafter, he was fired by Mr. Guernsey, who purportedly admitted that he had been terminated for, among other things, filing a discrimination charge. (*Id.*) After Mr. Gregor was fired, Mr. Valitchka and Mr. Stelter revised the job description for the regional sales representatives, adding new requirements that the sales representatives be physically able to climb into mines and quarries and engage in other similar kinds of physically demanding activities, and that the regional sales manager be in excellent physical condition. (*Id.* at ¶ 143.) In or about the summer or early fall of 1991,

the revised job description for salesmen was sent by Mr. Stelter, at Mr. Valitchka's instruction, to the physicians for the three oldest sales managers: Mr. Meagher, who underwent quintuple-bypass heart surgery; Mr. Pape, who had leukemia, and Mr. Smay, who had told Mr. Valitchka that he could not travel because he was having surgery; the revised job description was not sent to the doctors of the younger salesmen. (*Id.* at ¶¶ 144–145, 147; Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 144–145, 147.) The physicians were asked to submit a report confirming that these employees could meet the physical requirements set forth in the new job description. (Pl.Resp. to Def.Proposed Findings of Fact at ¶ 144.) The revised job requirements were not included in advertisements for new salesmen. (*Id.* at ¶ 146.) Mr. Gregor viewed these new physical requirements as part of SI's program to rid itself of older employees. (*Id.* at ¶¶ 148–149.)

In or around May of 1990, in response to instructions by Mr. Guernsey, Mr. Coxhill, then the Manager of Engineering at Appleton, compiled an organizational chart for the engineering department at Appleton which included each employee's name, years of service, date of birth, as well as the average age. (*Id.* at ¶¶ 160, 162.) At Mr. Guernsey's instruction, Mr. Coxhill presented this information to Swedish management at the international conference of Svedala engineers and technicians in Brazil later that month. (*Id.* at ¶¶ 161, 163.) Mr. Coxhill was later terminated and replaced by Mr. Quinn. (*Id.* at ¶ 165.) Within two (2) years after Mr. Guernsey became general manager of the Appleton unit, at least eleven (11) employees age fifty (50) or older were no longer employed: Mr. Weiss, age 54; Mr. Flavel, age 54; Mr. Spoonamore, age 56; Mr. Gregor, age 47; Jim Danielson, age 51; John Bandholtz, age 52; Mr. Jones, age 60; Mr. Isferding, age 64; Mr. Meagher, age 65; Mr. Smay, age 59; Mr. Conradt, age 53; and Mr. Coxhill, age 60. (*Id.* at ¶ 166.) SI considered the age of candidates for various employment positions in the company, including those for sales, engineering, human resources, legal, and other jobs. (*Id.* at ¶ 167.)

Bruce Merten was the human resources manager for SI when the United States facilities were purchased by SIAB from Allis–Chalmers; he was involuntarily terminated at age fifty (50), and replaced by William Lenhart, age forty-four (44), on June 30, 1992. (*Id.* at ¶¶ 168–169, 172.) The resume submitted by Lenhart to SI and SIAB did not include his date of birth; before he was interviewed in Sweden, and after he was asked by the acting human resources manager about his qualifications and experience, Mr. Lenhart was asked whether he was married, whether he had any children, and what his date of birth was—he was also told that, "in Sweden they have no laws against asking folks for their date of birth." (*Id.* at ¶¶ 170–171.) When Mr. Platner selected Mr. Fons as the new general counsel for SI, he utilized Mr. Fons' college graduation date to compute his age, which did not appear on his resume; Mr. Platner acknowledges that he would ask the age of any applicant for a senior management position. (*Id.* at ¶ 173.) Mr. Older similarly acknowledges requesting age information for employees hired by SIAB in Sweden, and SIAB management routinely lists applicants with their ages when hiring new personnel. (*Id.* at ¶ 174–176.) At the Milwaukee unit, applications for employment from older individuals were rejected with handwritten notations on resumes such as "No! 56 yrs old", "No! 53 year", and "MUST BE 65 year old!". (*Id.* at ¶¶ 177, 191.) Several of SI's personnel forms made reference to age, including its Salary Review Worksheet, Salaried Employee Listings, and Salaried Employee Rate Card. (*Id.* at ¶ 179.)

On February 13, 1991, the Milwaukee facility carried out a reduction in force ("RIF") which resulted in the termination of twenty (20) employees; eighteen of the twenty were over age forty (40), and one of the two under age forty (40) and the youngest of the other eighteen were subsequently rehired by SI. (*Id.* at ¶¶ 180–181.) Prior to the Milwaukee unit RIF, senior management from the unit met, together with certain consultants, to identify the specific employees who would be terminated; notes prepared by the consultants had a listing titled "Issues: Age." (*Id.* at ¶ 182.) A series of large flip charts were generated during the RIF planning meetings in Milwaukee containing notes of the discussions from the meetings, including notes about the persons under consideration for termination. (*Id.* at ¶ 183.) After the RIF planning meetings were concluded, the flip charts and notes were collected by Fred Cummings, the acting human resources manager for SI. (*Id.* at ¶ 184.) On July 29, 1992, in response to an EEOC request for information concerning age discrimination charges from two of those terminated in the February of 1991 RIF in Milwaukee, Mr. Lenhart wrote to SI's general counsel as follows: "I have the notes from Fred Cummings involvement, 2 inches worth. We need to sift through those and decide what to retain." (*Id.* at ¶ 185.) The flip charts have been destroyed, lost, or are otherwise missing. (*Id.* at ¶ 186.) Handwritten notes from two persons in attendance at the RIF meetings in Milwaukee include the age and/or date of birth for each person considered for termination; most of the terminated employees were fifty years of age or older. (*Id.* at ¶ 187.) After some of the terminated employees planned an age discrimination class action, SI prepared written performance "evaluations" for several of them explaining the reasons for their departure; Robert Jermyn, MPSI sales manager, was asked to prepare one such report, even though he had not participated in the RIF planning meeting. (*Id.* at ¶¶ 189–190.)

After they were involuntarily terminated, six of the plaintiffs and several other SI employees filed administrative charges of age discrimination, including Mr. Weiss, Mr. Flavel, Mr. Gregor, Mr. Jones, Robert Cnare, Robert Elbel, and Mr. Spoonamore; DILHR and two separate offices of the EEOC found probable cause to conclude that SI engaged in a practice of age discrimination against its older employees. (*Id.* at ¶ 197.)

### 1. *Byron Smay:*

Plaintiff Byron Smay was a district sales manager stationed in St. Louis, Missouri. (Def.Proposed Findings of Fact ¶ 4; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 198–200.) His territory included Arkansas, Illinois, Indiana, Kansas, Michigan, Missouri

and part of Kentucky. (Def.Proposed Findings of Fact ¶ 5.) Mr. Gregor was Mr. Smay's direct supervisor until his termination and replacement by Mr. Valitchka in July of 1991. (*Id.* at ¶¶ 15–16.) In February of 1990, after Mr. Guernsey had been general manager of the Appleton unit for four months, he told Mr. Gregor that he "had calculated the average age of our sales force, that it was too high, that he was accustomed to working with much younger people, and that [Mr. Gregor] needed to get younger, aggressive people in [the] sales force." (Pl. Resp. to Def.Proposed Findings of Fact ¶ 201.) Mr. Guernsey emphasized this point in Mr. Gregor's February of 1990 performance evaluation, writing that he should develop a "young generation of salesmen and manager candidates." (*Id.* at ¶ 202.) Mr. Gregor believed that the district sales managers reporting to him were knowledgeable, experienced, and doing a good job; however, he felt "tremendous pressure" from Mr. Guernsey to get "young and aggressive type salespeople," and believed that Mr. Guernsey was "fixated completely on the subject of age." (*Id.* at ¶¶ 203–204.)

Prior to replacing Mr. Gregor in April of 1991, Mr. Valitchka was interviewed by an executive search firm retained by SI, which told him that the age of SI's sales force, and its older group of sales representatives, posed a challenge. (*Id.* at ¶ 205.) In April of 1991, following a meeting with Mr. Guernsey, Mr. Valitchka told Mr. Gregor that the sales force was too old, and that the "average age of those people needed to be driven down and we needed to get young salespeople there, period, and that was the strategy." (*Id.*)

Mr. Smay disagreed with Mr. Valitchka's vision of the role of a district sales manager, and, along with the other district sales managers, disliked him and had little regard for his abilities. (Def.Proposed Findings of Fact ¶¶ 18–19.) According to the plaintiffs, SI imposed an inflated sales quota on Mr. Smay for 1991, a year when the industry was in a recession. (Pl.Resp. to Def. Proposed Findings of Fact ¶¶ 218–219.) In October of 1991, either Mr. Valitchka or Mr. Guernsey requested that Mr. Smay come to Appleton to discuss his poor sales performance for new equipment; through September of 1991, he had only achieved 15% of his target goal for new equipment sales. (*Id.;* Def.Proposed Findings of Fact ¶¶ 21–22.) Mr. Smay met with Mr. Valitchka, Mr. Stelter, and Mr. Guernsey, and was criticized for failing to meet his sales quota; no comments were made about his age, and he was not threatened with termination. (*Id.* at ¶¶ 23–25; Pl. Resp. to Def.Proposed Findings of Fact ¶¶ 218–219.) Mr. Valitchka sent Mr. Smay a memorandum in November of 1991 advising him that his performance was "unacceptable and cannot be tolerated"; in an internal memorandum generated months earlier, Mr. Smay was described as "extremely thorough, dedicated, and competent . . . one of our best people." (*Id.* at ¶ 220.) According to Mr. Smay, this criticism left him "very hurt and . . . [he] knew [he] was gone." (*Id.* at ¶ 221.)

In the summer of 1991, Mr. Smay underwent surgery at Barnes Hospital in the St. Louis area. (*Id.* at ¶ 229; Def.Proposed Findings of Fact ¶ 6.) He did not advise his superiors in Appleton or any other Appleton unit employee about his surgery or any resulting limitations on his work activities. (*Id.* at ¶ 7.) When Mr. Valitchka subsequently learned that Mr. Smay had experienced medical problems, he asked for the name of Mr. Smay's doctor so SI could ensure that he was assigned to a position appropriate for his medical condition. (*Id.* at ¶ 8.) Mr. Smay provided his doctor's name, and Mr. Stelter sent to his doctor a job description for his position of district sales manager, asking him to relate Mr. Smay's condition and prognosis to such position. (*Id.* at ¶¶ 9, 11–12.) According to the plaintiffs, the physical attributes listed in the "new" job description were not included in the version issued the previous year, and were intended to assure that the doctors of older employees would declare them to be unfit. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 227–229.) These attributes included excellent physical health, the ability to travel 80 to 90 percent of the week, a usual work week of ten and often 12 hours per day, regular weekend work, and the ability to climb onto structures and mines; according to the plaintiffs, these attributes were not

included in the job descriptions of other sales managers who did similar work or in advertisements for these jobs. (*Id.*) SI sent similar letters to the doctors of district sales managers Bernie Pape and William Meagher, who were suffering from cancer and heart disease, respectfully. (Def.Proposed Findings of Fact ¶ 13.) Mr. Smay's position was not altered after the letter was sent to his doctor. (*Id.* at ¶ 13.)

In late 1991, Greg Joseph was hired to fill the sales manager position formerly held by Mr. Gregor, and Mr. Smay began reporting to Mr. Joseph. (*Id.* at ¶¶ 27–28.) In March of 1992, Mr. Joseph met with Mr. Smay to give him his performance review and territory assignment. (*Id.* at ¶ 29.) Mr. Smay told Mr. Joseph that he disagreed with the review in light of his performance in prior years; age was not discussed and Mr. Joseph did not indicate that Mr. Smay would be terminated. (*Id.* at ¶¶ 30–31.) Mr. Joseph also advised Mr. Smay that his territory was being reconfigured to include Arkansas, Kansas, Louisiana, Mississippi, Missouri, Oklahoma, Tennessee, and part of Kentucky. (*Id.* at ¶ 32.) Mr. Smay had first suspected that a territorial reconfiguration was likely when, a few weeks before the review meeting, a customer in Indianapolis showed him an advertisement by SI seeking to fill a newly-created sales position to be stationed in Southern Ohio; although he did not cover Ohio, he suspected that the addition of a new salesman would result in a territorial reassignment. (*Id.* at ¶¶ 33–34; Pl.Resp. to Def.Proposed Findings of Fact ¶ 223.) Mr. Smay was upset about the territorial reassignment because he lost his prime states, Indiana, Michigan, and Illinois, and gained four southern states generally understood to have "zero potential"; however, he did not call the salesman who previously covered his reconfigured territory to confirm this fact. (*Id.* at ¶¶ 223–224; Def.Proposed Findings of Fact ¶¶ 35–36.) Mr. Smay believed that SI was trying to get rid of him. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 225.)

In early May of 1992, Mr. Smay advised Mr. Joseph that he was retiring after twenty-six years of employment with SI and its predecessor, Allis–Chalmers. (*Id.* at ¶ 37; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 200.) He was replaced by Richard Robinson, age thirty-seven (37). (*Id.* at ¶ 230.) Nobody from SI asked him to retire and he did not tell Mr. Joseph of his age discrimination concerns. (Def.Proposed Findings of Fact ¶ 38.) In a subsequent conversation with Mr. Stelter, Mr. Smay indicated that he wanted to look after some personal investments. (*Id.* at ¶ 39.) Mr. Smay does not recall telling Mr. Stelter that he was coerced to leave. (*Id.* at ¶ 40.) At the time his employment ended, nobody was criticizing him for his 1992 sales performance. (*Id.* at ¶ 41.) Mr. Smay was fifty-nine (59) when he retired. (*Id.* at ¶ 42.) On May 11, 1992, Mr. Joseph sent a letter to Mr. Smay asking him to "reconsider and continue [his] employment with Allis Mineral Systems"; he did not respond. (*Id.* at ¶¶ 43–44.) With Mr. Smay's assistance, SI closed its St. Louis sales office. (*Id.* at ¶ 45.)

On June 15, 1994, Mr. Smay began work with Lippman–Milwaukee Company—a competitor of SI; his boss at Lippman is Mr. Gregor. (*Id.* at ¶¶ 46–47.) He had discussed the possibility of working for Lippman prior to leaving SI. (*Id.* at ¶ 48.) Although he was aware of age discrimination claims being alleged by Mr. Flavel and others when he retired, Mr. Smay did not contact the EEOC or any state agency about his age discrimination concerns. (*Id.* at ¶¶ 49–50.) Mr. Smay did not initially pursue legal action after leaving SI because he was "concerned about getting on with [his] life ... trying to move forward at basically 60 years old is not the easiest thing in the world to do." (Pl.Resp. to Def.Proposed Findings of Fact ¶ 231.) In November of 1993, the EEOC contacted Mr. Smay about becoming involved in this action; Mr. Smay agreed. (Def.Proposed Findings of Fact ¶¶ 51–52.)

### 2. *William Meagher:*

Plaintiff William Meagher was a district sales manager at Appleton; his office was in Tarpon Springs, Florida, and his territory included Florida, Georgia and Alabama. (*Id.* at ¶¶ 53–54.) In 1987, prior to SI's acquisition of the Appleton unit, he had been asked to list his expected retirement date on a form and return it to the Manager of Employee

and Community Relations, Jim Conradt. (*Id.* at ¶ 55.) Mr. Meagher indicated that he intended to retire at age sixty-two (62). (*Id.* at ¶ 56.)

Mr. Gregor was the national sales manager directly supervising Mr. Meagher until April of 1991, when he was replaced by Mr. Valitchka; Mr. Joseph replaced Mr. Valitchka in December of 1991. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 200.) In February of 1990, after Mr. Guernsey had been general manager of the Appleton unit for four months, he told Mr. Gregor that he "had calculated the average age of our sales force, that it was too high, that he was accustomed to working with much younger people, and that [Mr. Gregor] needed to get younger, aggressive people in [the] sales force." (*Id.* at ¶ 201.) Mr. Guernsey emphasized this point in Mr. Gregor's February of 1990 performance evaluation, writing that he should develop a "young generation of salesmen and manager candidates." (*Id.* at ¶ 202.) Mr. Gregor believed that the district sales managers reporting to him were knowledgeable, experienced, and doing a good job; however, he felt "tremendous pressure" from Mr. Guernsey to get "young and aggressive type salespeople," and believed that Mr. Guernsey was "fixated completely on the subject of age." (*Id.* at ¶¶ 203–204.) Mr. Meagher was asked about his retirement plans in 1990 by Mr. Gregor, who indicated that he needed to know whether he should budget for a replacement; Mr. Meagher indicated that he was planning on retiring in March of 1992, on his sixty-fifth (65) birthday. (Def.Proposed Findings of Fact ¶¶ 57–59; Pl.Resp. to Def.Proposed Findings of Fact ¶ 217.)

Although the industry in which SI sold equipment was in a recession, Mr. Guernsey imposed a $1 million sales goal for Mr. Meagher's territory, despite a contrary assessment that, due to the poor economy, an attainable goal was $250,000. (*Id.* at ¶ 212.) Mr. Gregor told Mr. Guernsey that, if Mr. Meagher was going to "increase sales even remotely in the direction of the stretch goals," he would need support in the form of products and designs. (*Id.* at ¶ 213.) Mr. Guernsey told Mr. Gregor that Mr. Meagher was an "old incompetent," and told Mr. Gre-

gor to fire that "old son-of-a-bitch in Florida" and to replace him with "young blood"; when Mr. Gregor protested, Mr. Guernsey said he'd get Mr. Stelter "to figure out a way to do [it]." (*Id.* at ¶¶ 207–208, 213.) Mr. Meagher, unable to meet his sales goal, was informed in October of 1991 that his sales were "obviously unacceptable and below standard," and that "we are taking steps to replace you as soon as possible." (*Id.* at ¶ 214.) Mr. Gregor advised Mr. Meagher that Mr. Guernsey thought he should be fired because of poor sales performance; no mention was made of age. (Def.Proposed Findings of Fact ¶¶ 60–61.) Mr. Gregor told Mr. Meagher not to worry because he was not going to fire him. (*Id.* at ¶ 62.) According to Mr. Meagher, however, his knowledge that Mr. Guernsey had prejudged him as incompetent and wanted him fired "helped make [his] decision to retire." (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 209–210.)

Prior to replacing Mr. Gregor in April of 1991, Mr. Valitchka was interviewed by an executive search firm retained by SI, which told him that the age of SI's sales force, and its older group of sales representatives, posed a challenge. (*Id.* at ¶ 205.) In April of 1991, following a meeting with Mr. Guernsey, Mr. Valitchka told Mr. Gregor that the sales force was too old, and that the "average age of those people needed to be driven down and we needed to get young salespeople there, period, and that was the strategy." (*Id.*)

On May 13, 1991, while traveling in Alabama on business, Mr. Meagher suffered a heart attack and underwent quintuple-bypass surgery. (Def.Proposed Findings of Fact ¶ 63.) Mr. Meagher was unable to work for several months, during which time he received disability payments. (*Id.* at ¶ 64.) On July 1, 1991, he returned to work on a part-time basis; he was paid on an hourly basis until he resumed full-time status at his former salary. (*Id.* at ¶¶ 66–67.) For several months after he returned to work, Mr. Meagher was limited in his ability to perform his job, including the ability to travel. (*Id.* at ¶ 68.) After returning to work in July of 1991, Mr. Valitchka asked Mr. Meagher to provide a list of his doctors so that SI could

ensure that he was assigned to a position that was appropriate for his medical condition. (*Id.* at ¶ 69.) Mr. Meagher provided such names, and Mr. Stelter sent letters to his doctors asking for his current status and prognosis for purposes of job placement. (*Id.* at ¶¶ 70–71.) According to the plaintiffs, the physical attributes listed in his "new" job description were not included in the version issued the previous year, and were intended to assure that the doctors of older employees would declare them to be unfit. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 227–229.) These attributes included excellent physical health, the ability to travel 80 to 90 percent of the week, a usual work week of ten and often 12 hours per day, regular weekend work, and the ability to climb onto structures and mines; according to the plaintiffs, these attributes were not included in the job descriptions of other sales managers who did similar work or in advertisements for these jobs. (*Id.*) Mr. Meagher's position was not altered after this correspondence. (Def.Proposed Finding of Fact ¶ 72.)

After his heart attack and surgery, Mr. Meagher reiterated his desire to retire upon his sixty-fifth (65) birthday. (*Id.* at ¶ 73.) He specifically encouraged a colleague in his mid-fifties to pursue his job, and he advised another colleague to apply for the position, stating that SI was a good company for which to work. (*Id.* at ¶¶ 76–78.) While disappointed that he was not consulted about the process, Mr. Meagher believed it was reasonable for SI to advertise for his replacement, although he believed that SI exhibited poor judgment by not hiring his replacement at least six months before his retirement so he could properly train the new salesman. (*Id.* at ¶¶ 74–75.) In January of 1992, Mr. Meagher closed down the Tarpon Springs office and arranged for all the files to be shipped to Atlanta, Georgia, where his replacement, Mike Schelble, age twenty-eight (28), was to be located. (*Id.* at ¶ 79; Pl.Resp. to Def.Proposed Findings of Fact ¶ 230.) Mr. Schelble spent several days with Mr. Meagher for training purposes, including attending an industry trade show in New Orleans in February of 1992. (Def.Proposed Findings of Fact ¶¶ 80–82.)

Mr. Meagher retired in March of 1992, on or about his sixty-fifth (65) birthday. (*Id.* at ¶ 84.) SI subsequently flew him and his wife to Appleton for a retirement party. (*Id.* at ¶ 85.) According to Mr. Meagher, he retired because he felt "that they wanted to force me out." (Pl.Resp. to Def.Proposed Findings of Fact ¶ 217.) Mr. Meagher did not file an age discrimination charge with the EEOC because of his limited income after leaving employment, and became involved in this action after being contacted by the EEOC in October of 1993. (*Id.* at ¶ 231; Def.Proposed Findings of Fact ¶¶ 86–87.)

### 3. *Robert Isferding:*

Plaintiff Robert Isferding was born on October 12, 1927, and joined Allis–Chalmers on September 15, 1973 as a Senior Application Engineer in Appleton. (Def.Proposed Findings of Fact ¶ 88; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 292–293.) In 1977, Mr. Isferding transferred to a field sales position in Charleston, West Virginia; in 1985, he returned to Appleton as a Senior Project and Application Engineer. (*Id.* at ¶¶ 294–295.) Mr. Isferding specialized in the sizing and application of screens. (*Id.* at ¶ 296.) Mr. Isferding reported to Mr. Quinn from September of 1985 until July of 1991, and his performance was reviewed yearly. (Def.Proposed Findings of Fact ¶¶ 89–90.) His performance was always satisfactory. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 297.) Mr. Quinn would only allow Mr. Isferding to read the front page of his review, and Mr. Isferding never saw any of Mr. Quinn's comments discussed with him the specific items set forth in the progress review. (*Id.* at ¶ 321.) In each progress review by Mr. Quinn from 1985 through 1989, Mr. Quinn identified "finishing his career in his present position" as Mr. Isferding's long-term career objective; from 1980 to 1983, however, Mr. Farnsworth always included advancing into management in his long-term career objective. (*Id.*) Mr. Isferding testified that his goal had always been to obtain a management position with the company. (*Id.*) On December 22, 1989, Mr. Guernsey sent a memo to all of his managers asking that they identify the projected retirement dates of certain listed individuals; Mr. Quinn, when asked to identify the retirement dates of Mr.

Isferding, Mr. Jones, and Don Hagen, responded that "all my people underlined in red plan on going till 65!" (*Id.* at ¶ 298.)

Shortly after Mr. Guernsey was hired as general manager at Appleton, Mr. Isferding claims that he began to experience harassment from Mr. Quinn, including kicking objects, screaming, cussing, abusive language, pounding his desk, and throwing books. (*Id.* at ¶ 300.) Mr. Quinn would use foul language, including "God damn" and "fucking," and Mr. Isferding would sometimes back away from Mr. Quinn for fear of being struck. (*Id.*) This conduct continued on an average of "at least once a month until July of 1991." (*Id.*) Mr. Isferding observed Mr. Quinn engage in abusive conduct toward Mr. Jones and Mr. Hagen; while he also observed abusive behavior towards the younger engineers, it was "not as bad as it was with us older engineers." (*Id.* at ¶¶ 301–302.) Mr. Isferding specifically recalls an incident where he and Mr. Jones were in Mr. Quinn's office working on a contract; after asking Mr. Quinn some questions, Mr. Quinn started "throwing a tantrum, swearing and cussing. He kicked the file cabinet, kicked the door, and just humiliated us in public, because the door was open and the whole office could hear what was going on." (*Id.* at ¶ 303.) After Mr. Quinn "went off into a rage" when being questioned by Mr. Isferding about a project, Ron Hirn, a purchaser, approached Mr. Isferding and said that he "ought to go down and knock that son of a bitch on his ass." (*Id.* at ¶ 304.) Mr. Isferding did not tell anyone else about these incidents, and did not report them to Mr. Guernsey. (Def.Proposed Findings of Fact ¶ 95.) None of Mr. Quinn's outbursts ever included comments regarding Mr. Isferding's age. (*Id.* at ¶ 98.) When Mr. Quinn would swear and rage at Mr. Isferding, it would cause Mr. Isferding to "shrink down in his chair." (Pl. Resp. to Def.Proposed Findings of Fact ¶ 305.) After several such instances, Mr. Isferding began avoiding Mr. Quinn. (*Id.* at ¶ 306.) Other employees witnessed such behavior, and SI management was aware of Mr. Quinn's conduct toward Mr. Isferding and other older employees. (*Id.* at ¶¶ 307–310.)

During their January 31, 1991 meeting regarding performance, Mr. Isferding informed Mr. Quinn that he intended to retire after putting twenty (20) years in with the company; Mr. Quinn did not ask him to retire or indicate that he would be fired or that his job was in jeopardy, and told him that his performance was fine. (*Id.* at ¶ 323; Def.Proposed Findings of Fact ¶¶ 91–93.) In the spring of 1991, Mr. Isferding commented to Mr. Gregor that Mr. Quinn's behavior was occurring frequently and was wearing on him; he was losing sleep and behavioral changes were noticed by his wife. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 311, 319.) Mr. Gregor told Mr. Quinn that "the way he was treating these people was completely inappropriate"; Mr. Quinn wanted to know which employees were complaining about him, and indicated that he had no intention of changing his style. (*Id.* at ¶ 312.) Mr. Foy was also aware of, and spoke with Mr. Guernsey regarding, Mr. Quinn's abusive behavior. (*Id.* at ¶ 313.) Mr. Platner acknowledged that he knew that Mr. Quinn was an "abusive" manager. (*Id.* at ¶ 315.) During his performance review, Mr. Quinn was told that he could be "blunt" and "direct," and that he "should aim to be more tactful." (*Id.* at ¶ 316.)

Mr. Isferding observed that young engineers would sit in Mr. Quinn's office to discuss matters for several hours at a time, while Mr. Quinn never had time to answer his questions. (*Id.* at ¶ 317; Def.Proposed Findings of Fact ¶ 99.) Mr. Isferding and Mr. Jones were excluded from distributor meetings in 1990 and 1991; the younger Application Engineers, however, were invited. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 318.) Mr. Isferding had participated in such meetings prior to 1991. (*Id.*) He never inquired as to why he was not invited. (Def. Proposed Findings of Fact ¶ 100.) Mr. Isferding spoke with Mr. Jones and Mr. Hagen about the treatment they were receiving from Mr. Quinn; they concluded that Mr. Quinn "just didn't want to get involved with the older people." (Pl.Resp. to Def.Proposed Findings of Fact ¶ 320.) Mr. Isferding was also offended that he was not individually invited to a company picnic in the fall of 1990. (Def.Proposed Findings of Fact ¶ 101.)

In July of 1991, the Application Department was reorganized; Mr. Quinn was promoted to Manager of Engineering, taking with him three young engineers, and Mr. Hagen and Mr. Isferding, the two oldest engineers, were transferred to the parts department as customer service representatives, reporting to Gary Wichtel. (*Id.* at ¶ 324; Def.Proposed Findings of Fact ¶ 102.) The parties dispute whether this constituted a demotion. (*Id.* at ¶¶ 102–104; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 324–325.) Mr. Hagen and Mr. Isferding were given responsibility for taking parts orders, a function handled prior to reorganization by clerical people in the parts department; they were no longer involved in the sizing of equipment, a duty transferred to the engineers in Mr. Quinn's department and done primarily by computers. (*Id.* at ¶ 325–326; Def.Proposed Findings of Fact ¶ 106.) Prior to the reorganization, Mr. Isferding had manually performed the sizing of screens; the plaintiffs claim that afterwards, even though he no longer had this duty, he was nonetheless required to train the younger engineers on how to perform this function. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 327.) Mr. Isferding's salary did not change as a result of the reorganization, and he no longer had contact with Mr. Quinn. (Def.Proposed Findings of Fact ¶¶ 103, 108–109.) Unlike Mr. Quinn, Mr. Wichtel never screamed at Isferding or other employees. (*Id.* at ¶¶ 110–111.)

Mr. Isferding claims that after the reorganization, he could see no future with the company, his job had become unbearable because of the harassment and the demotion of himself and other older employees, and he believed he would be fired. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 330.) After three weeks in the Parts Department, Mr. Isferding gave Mr. Wichtel verbal notice that he would be leaving the company in October of 1991. (*Id.* at ¶ 331; Def.Proposed Findings of Fact ¶ 112.) Mr. Isferding and his wife had planned to stay in Wisconsin for at least two more years while she finished her schooling. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 332.) He did not advise anyone in management that he was being forced out; according to him, he "was kind of humil-iated and [ ] felt bad, [and] didn't want to have to tell them that after [his] years of service that they would do something like this to [him]." (*Id.* at ¶ 333; Def.Proposed Findings of Fact ¶ 116.) Before leaving, Mr. Isferding trained another employee to perform his duties; the defendants indicate that his position was not refilled, while the plaintiffs claim that he was replaced by Randall Fischer, age thirty-five (35). (*Id.* at ¶ 113; Pl.Resp. to Def.Proposed Findings of Fact ¶ 337.) An in-house retirement party was held for him on his last day and he received several gifts. (*Id.* at ¶ 336; Def.Proposed Findings of Fact ¶ 114.) Mr. Isferding was sixty-four (64) years of age when he left employment with SI. (*Id.* at ¶ 115.) The company did not give him an exit interview before he left. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 335.)

When Mr. Isferding left SI, Mr. Wichtel recommended to Mr. Guernsey that SI's Nitro facility in West Virginia use him for consulting work; Mr. Isferding had previously worked for Nitro, was very interested in working there again, and did not want to jeopardize that opportunity. (*Id.* at ¶ 334.) After building a house on land they owned, he and his wife moved to West Virginia in January of 1992. (*Id.* at ¶ 338.) Mr. Isferding has sought employment since leaving SI. (*Id.* at ¶ 339.)

In the late summer or early fall of 1992, Mr. Isferding received two phone calls from Rita Burns of the EEOC; he did not tell her that he believed that he had been forced out of the company, that he had been a victim of age discrimination, or that Mr. Quinn's conduct and abusive language were age-related or affected his decision to leave SI. (*Id.* at ¶ 340; Def.Proposed Findings of Fact ¶¶ 117–121.) According to Mr. Isferding, he kept these beliefs to himself out of embarrassment and to save face. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 340.) After he spoke with the EEOC, he discussed the matter with his wife and "began to put the pieces together and view more clearly all that had happened." (*Id.* at ¶ 341; Def.Proposed Findings of Fact ¶ 122.)

#### 4. *Robert Jones:*

Plaintiff Robert Jones was born on August 20, 1930, and joined Allis–Chalmers of Canada in 1955. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 232–233.) Except for a four-month period in 1965, Mr. Jones worked continuously for Allis–Chalmers and its successors from 1955 until May 31, 1991. (*Id.* at ¶ 234.) In 1975, Mr. Jones transferred from Canada to Appleton because he was looking for "more responsibilities," "more challenges," and he wanted to "improve his position"; he accepted the position of Senior Project Application Engineer. (*Id.* at ¶ 235; Def.Proposed Findings of Fact ¶ 124.) Mr. Jones specialized in primary gyratory crushers, which cost several million dollars each. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 236.)

From 1985 until he left SI, Mr. Jones was supervised by Mr. Quinn. (*Id.* at ¶ 237; Def.Proposed Findings of Fact ¶ 125.) During his 1987 performance review, Mr. Jones claims that Mr. Quinn told him that he thought Mr. Jones was only putting in time until retirement; Mr. Jones, insulted, told Mr. Quinn that that was not true. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 238.)

According to the plaintiffs, after Mr. Guernsey became general manager of Appleton in November of 1989, Mr. Quinn's behavior toward Mr. Jones became very abusive; Mr. Jones was subjected to outbursts from Mr. Quinn at the rate of approximately twice a month. (*Id.* at ¶ 239; Def.Proposed Findings of Fact ¶¶ 128–129.) Mr. Quinn would yell, scream, belittle, and swear at Mr. Jones in front of others; he pounded his desk, and kicked filing cabinets; and he would fly into a rage over a minor incident or when Mr. Jones asked for clarification. (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 240–241.) On one such occasion, Mr. Quinn purportedly "flew into a rage" over questions of freight charges; in another incident, Mr. Quinn yelled at Mr. Jones at the coffee machine after Mr. Jones prepared a chronological list of events occurring on a project with SI's sister company in Australia. (*Id.* at ¶ 242.) On another occasion, Mr. Quinn demonstrably rebuked Mr. Jones for adopting a different method than suggested in doing a feed analysis; in another incident, Mr. Quinn "went into a rage" when Mr. Jones asked the manager of Svedala in Canada to assist him in allocating freight costs in returning a primary crusher. (*Id.*)

Other employees witnessed this behavior toward Mr. Jones; for example, Mr. Spoonamore overheard Mr. Quinn yell at Mr. Jones "You dumb son-of-a-bitch, what are you doing there" and kick a cabinet, and Mr. Foy and Mr. Gregor observed Mr. Quinn act abusive toward Mr. Jones, Mr. Isferding, Mr. Flavel, Mr. Hagen, and other older employees. (*Id.* at ¶¶ 258, 260–263, 266.) When Mr. Gregor told Mr. Quinn that he was acting inappropriately, Mr. Quinn was surprised, wanted to know which employees were complaining about him, and indicated that he did not intend on changing his approach. (*Id.* at ¶ 265.) Mr. Jones also observed Mr. Quinn exhibit similar behavior toward other older employees, including Mr. Hagen and Mr. Isferding, but not toward younger engineers; he believed the severity of these outbursts to be unwarranted and unprofessional. (*Id.* at ¶¶ 249, 270; Def.Proposed Findings of Fact ¶¶ 130–131.) While the defendants claim that Mr. Jones did not report Mr. Quinn's conduct to anyone at SI, the plaintiffs argue that Mr. Jones spoke to Mr. Foy about it, and that SI management, including Mr. Guernsey and Mr. Platner, had knowledge of Mr. Quinn's abusive behavior toward Mr. Jones. (*Id.* at ¶ 132; Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 259, 266–268.) During his performance review, Mr. Quinn was told that he could be "blunt" and "direct," and that he "should aim to be more tactful." (*Id.* at ¶ 269.)

Mr. Quinn testified that Mr. Jones' performance was satisfactory. (*Id.* at ¶ 243.) Mr. Jones found performance reviews by Mr. Quinn to be very uncomfortable and intimidating, with Mr. Quinn raising his voice and making negative remarks. (*Id.* at ¶ 248.) Mr. Jones did not discuss his performance evaluations with Mr. Quinn. (Def. Proposed Findings of Fact ¶ 133.) During his 1989 performance review, Mr. Quinn asked Mr. Jones whether he had any plans to retire. (*Id.* at ¶ 126; Pl. Resp. to Def. Proposed Findings of Fact ¶ 244.) Mr. Jones told Mr.

Quinn that he would stay as long as possible, and that he would give one year's notice if he intended to retire. (*Id.;* Def. Proposed Findings of Fact ¶ 127.) Mr. Jones did not tell Mr. Quinn his career goals; nevertheless, Mr. Quinn wrote on Mr. Jones' 1989 performance review that his "long-range career objective" was to "finish [his] career at Boliden–Allis." (Pl. Resp. to Def. Proposed Findings of Fact ¶ 245.) Even though Mr. Jones never gave Mr. Quinn a specific retirement date, Mr. Quinn wrote to Mr. Guernsey in response to the latter's December 22, 1989 request for the projected retirement date for Mr. Jones, Mr. Isferding and Mr. Hagen that "all my people underlined in red plan on going till 65!" (*Id.* at ¶ 246.) In Mr. Jones' performance review for the calendar year 1990, which was given to him during a meeting in January of 1991, Mr. Quinn wrote down as his long-term career objective: "organize and publish gyratory crusher information for future generations"; Mr. Jones had not given any indication that he intended to retire or otherwise leave the company. (*Id.* at ¶ 247.)

Mr. Jones and the other older engineers also felt that the younger engineers received favorable treatment and more individualized attention from Mr. Quinn. (*Id.* at ¶¶ 250, 256.) For example, when an application conference regarding hydrocones was held in Sweden, SI sent the two youngest project engineers from the Application Department, even though one had been in the department for only one month. (*Id.* at ¶ 252.) In addition, while Mr. Jones and Mr. Isferding had in the past participated in SI's annual two-day meeting in Appleton for its distributors, they were not invited to the meetings during their last two years, even though the younger engineers were, in fact, invited. (*Id.* at ¶ 253.) Mr. Quinn also refused to allow Mr. Jones to take an extra day of vacation, instead docking him a day of pay, when Mr. Jones was one day late in returning from a vacation because of a snow storm in Appleton; that same day, SI closed its office and sent all of its employees home with pay because of the weather. (*Id.* at ¶ 251.) When Mr. Jones mentioned to Mr. Hagen that Mr. Quinn was pretty hard on him, Mr. Hagen responded: "Oh, I'm the same, I have

the same problem, I just think he has something against older people"; Mr. Isferding shared this conclusion. (*Id.* at ¶ 255–256.)

Mr. Jones believed that the treatment he was receiving from Mr. Quinn was part of a company-wide policy implemented when Mr. Guernsey was hired to force out older employees. (*Id.* at ¶ 271.) Mr. Jones found Mr. Quinn's treatment distressing, and believes that it affected his health and disposition. (*Id.* at ¶ 272.) In early to mid-February of 1991, Mr. Jones asked Mr. Quinn if they could talk; after Mr. Quinn responded that "you've got 30 seconds," Mr. Jones stated that he was leaving. (*Id.* at ¶ 273; Def. Proposed Findings of Fact ¶¶ 134–135.) At about noon that day, Mr. Quinn asked Mr. Jones if he would mind if Mr. Quinn announced his retirement to the rest of the staff at the three o'clock department meeting; Mr. Jones reluctantly agreed. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 274.) At that meeting, Mr. Quinn announced that Mr. Jones was leaving and invited Mr. Jones to state the reasons; Mr. Jones, reluctant to recite Mr. Quinn's abusive treatment, indicated that he wished to pursue other interests, was interested in working as a consultant for SI, and intended to eventually move to Colorado to be closer to his daughters. (*Id.;* Def. Proposed Findings of Fact ¶¶ 136–137.) Mr. Jones had no further discussions with Mr. Quinn or Mr. Stelter regarding his reasons for leaving; after the meeting, Alice Cordes, the department secretary, told Mr. Jones that he did not have to let Mr. Quinn "push him out." (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 275–276.)

After Mr. Jones' retirement announcement, Mr. Quinn's abusive behavior towards him allegedly stopped. (*Id.* at ¶ 277.) Against his wishes, Ms. Cordes organized a retirement party for him; Mr. Jones (unsuccessfully) instructed her not to invite Mr. Quinn, and forty (40) to fifty (50) Appleton employees attended. (*Id.* at ¶ 279; Def. Proposed Findings of Fact ¶ 139.) Mr. Jones did not tell anyone before he left that he felt he had been forced out because of harassment and age discrimination; he claims that he did not want to jeopardize any opportuni-

ty to do consulting work for SI. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 278.)

Mr. Jones retired on May 31, 1991, at age sixty (60). (Def. Proposed Findings of Fact ¶¶ 138, 140.) While he was not individually replaced, his duties were spread among several employees, including Carol Cihak, Mr. Isferding, Mr. Hagen, Randy Fischer, and Sherry McGlin. (*Id.* at ¶ 141; Pl. Resp. to Def. Proposed Findings of Fact ¶ 281.) After Mr. Jones left SI, Mr. Gregor purportedly told him that "no matter what you did, you didn't have a chance, [Quinn] was out to get you." (*Id.* at ¶ 280.) Mr. Jones subsequently sold his house in Appleton and moved to Colorado where his son and two daughters live. (Def. Proposed Findings of Fact ¶ 142.) Mr. Jones talked with a number of individuals and companies regarding consulting work; he did some consulting work after his departure from Appleton for Allis–Chalmers Canada and Iron Ore Company of Canada. (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 288–289.) He is currently employed as a downhill ski instructor in Frisco, Colorado. (*Id.* at ¶ 290; Def. Proposed Findings of Fact ¶ 143.) He cross-country skis approximately eight (8) hours a week and participates in ski races during the winter, and bikes approximately ten (10) hours a week during the summer. (*Id.* at ¶ 144; Pl. Resp. to Def. Proposed Findings of Fact ¶ 291.)

Mr. Jones filed a charge of age discrimination with the EEOC on December 2, 1991, approximately seven months after he left SI, alleging that Mr. Quinn's harassment forced him to leave. (*Id.* at ¶ 282; Def. Proposed Findings of Fact ¶ 145.) Upon learning of Mr. Jones' charge, Mr. Stelter contacted Mr. Jones to discuss reemployment, offering him his job back at his prior salary. (*Id.* at ¶ 146; Pl. Resp. to Def. Proposed Findings of Fact ¶ 283.) According to the plaintiffs, Mr. Jones received no assurances from Mr. Stelter that Mr. Quinn's behavior had changed, or that anyone had talked to Mr. Quinn about his abusive behavior; instead, Mr. Jones was told "you'll have to work this out with Pat Quinn, he doesn't hold a grudge against you." (*Id.* at ¶ 284.) The defendants, however, indicate that Mr. Stelter offered to set up a meeting with Mr. Quinn to discuss the prior problems, offered Mr. Jones the opportunity to work full or part time, and advised Mr. Jones that he would report to Mr. Thomas rather than Mr. Quinn if he agreed to return. (Def. Proposed Findings of Fact ¶¶ 147–149.) According to the defendants, Mr. Jones did not accept reinstatement because he and his wife were eager to move to Colorado. (*Id.* at ¶ 150.) The plaintiffs, however, claim that, while Mr. Jones was eager to return to SI, he was uncomfortable having to continue working with Mr. Quinn, and feared that the offer was simply being made so that he would drop his EEOC charges. (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 285–286.)

### 5. *Major Coxhill:*

Plaintiff Major Coxhill began his career with Allis–Chalmers in 1964; although he left the company briefly to work for another business, he worked there cumulatively for twenty-four (24) years and worked in the Engineering Department of the Appleton unit since 1972. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 342.) Mr. Coxhill became Manager of Engineering for the Appleton unit, and a first report to the general manager, in 1986; he remained in this position when Mr. Guernsey replaced Mr. Farnsworth as general manager in November of 1989. (*Id.* at ¶¶ 343, 346; Def. Proposed Findings of Fact ¶ 151.)

Prior to 1989, Mr. Coxhill received very positive performance reviews from Mr. Farnsworth. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 345.) In late 1989 or early 1990, Mr. Guernsey informed Mr. Quinn that he would replace Mr. Coxhill as Manager of Engineering; Mr. Guernsey had been in his position for only several months, had conducted no formal performance review of Mr. Coxhill, and had not indicated in any way that Mr. Coxhill's performance was not acceptable. (*Id.* at ¶¶ 347–348.) In February of 1990, Mr. Guernsey reviewed Mr. Coxhill's performance for 1989, giving him a very favorable performance rating and assuring him that, although some management changes might be made, his job was not in jeopardy. (*Id.* at ¶ 349.) Mr. Guernsey did not inform Mr. Coxhill that he had already told Mr. Quinn that Mr. Quinn would be

replacing Mr. Coxhill as Manager of Engineering. (*Id.* at ¶ 350.)

In approximately May of 1990, Mr. Guernsey asked Mr. Coxhill to prepare information for SIAB management regarding the individual and average ages of each of the employees in the Engineering Department. (*Id.* at ¶ 351.) In response to this request, Mr. Coxhill prepared an organizational chart which showed the name, birth date, and years of service of each employee in the Engineering Department as well as the average age of all employees in the department; the chart was presented by Mr. Coxhill to Swedish management of SIAB at an international product meeting held in Brazil that month. (*Id.* at ¶ 352.) The chart revealed that Mr. Coxhill, at age sixty (60), was the oldest member of the department. (*Id.* at ¶¶ 352–353.) In approximately November of 1990, Mr. Guernsey, along with members of management at Appleton, attended a conference in Sweden regarding product development; while Mr. Coxhill would normally have attended such a meeting, he was told by Mr. Guernsey not to attend. (*Id.* at ¶ 354.) At the conference, Mr. Guernsey told SIAB management that he wanted to "give Major a rest" and that Mr. Coxhill would be removed from his position as Manager of Engineering. (*Id.* at ¶ 355.)

In February of 1991, Mr. Coxhill received a review of his performance in 1990; Mr. Guernsey rated him a 2–plus, but told Mr. Coxhill that he rated all of his managers stringently and that Mr. Coxhill should not worry about it, and did not tell Mr. Coxhill that his performance was unacceptable or that he was in jeopardy of losing his position. (*Id.* at ¶¶ 356–357, 359.) Mr. Coxhill believed that this rating was unfair and unjustified, and expressed his objections. (*Id.* at ¶ 358.)

On April 1, 1991, Mr. Guernsey summoned Mr. Coxhill to his office, and informed him that, as part of a departmental reorganization, he was being removed from his position as Manager of Engineering, and replaced by Mr. Quinn. (*Id.* at ¶ 361; Def. Proposed Findings of Fact ¶ 152, 156.) According to Mr. Coxhill, Mr. Guernsey then asked him whether he had considered retirement, and told him that Mr. Stelter was "standing by"

to discuss with him that option; Mr. Guernsey then instructed Mr. Coxhill to take the rest of the day off from work to consider his options. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 362; Def. Proposed Findings of Fact ¶ 164.) Mr. Guernsey also purportedly told Mr. Coxhill that he was going to prepare an announcement regarding the job change, and asked Mr. Coxhill whether he would like to "fluff it up." (Pl. Resp. to Def. Proposed Findings of Fact ¶ 363.) According to Mr. Coxhill, he had no interest in retiring and was not told that he would be reassigned to another position or given any other job at Appleton. (*Id.* at ¶¶ 364–365, 367.) Mr. Coxhill was not told that he was being terminated. (Def. Proposed Findings of Fact ¶ 166.) Mr. Coxhill met with Mr. Stelter as instructed, told him he did not wish to retire, and took the remainder of the day off. (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 366–368.) Mr. Coxhill claims that he was given no other alternative from Mr. Guernsey other than retirement, and believed that he would be fired if he did not retire. (*Id.* at ¶¶ 369–370.) At no time prior to this meeting had Mr. Coxhill been informed by Mr. Guernsey or any other senior manager of SI that his performance was unsatisfactory or that his position was in jeopardy. (*Id.* at ¶ 372.)

The next day, Mr. Coxhill called Mr. Platner; while the plaintiffs indicate that he informed Mr. Platner that he was very angry and considering legal action, the defendants claim that he did not indicate to Mr. Platner that he believed he had been discriminated against on the basis of age. (*Id.* at ¶¶ 373–374; Def. Proposed Findings of Fact ¶ 157.) Mr. Coxhill then left Appleton for a short vacation. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 375.) On April 3, 1991, Mr. Guernsey issued a company-wide memorandum announcing various changes in the organizational structure of the Appleton unit, including Mr. Coxhill's replacement as Manager of Engineering by Mr. Quinn. (*Id.* at ¶ 376.) When Mr. Coxhill returned, Mr. Guernsey advised him that the company had a new assignment for him as Chief Engineer of Product Quality; although Mr. Coxhill considered this to be a "concocted" position

and a demotion, and believed that it prevented him from competing for other positions in the company including Business Manager (a position he admits ideally required skills he did not possess), his salary did not change and he retained the same benefits and bonus plan. (*Id.* at ¶¶ 377–379, 382–383; Def. Proposed Findings of Fact ¶¶ 153–155; Def. Reply to Pl. Resp. to Def. Proposed Findings of Fact ¶ 382.) As Manager of Engineering, Mr. Coxhill had supervisory responsibility over thirty (30) engineers, and was a first report to the general manager; as Chief Engineer of Product Quality, Mr. Coxhill had no supervisory responsibility over any engineers, was no longer a first report to the general manager, and no longer participated in senior management staff meetings. (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 380–383.)

According to Mr. Coxhill, this series of events left him devastated and humiliated, and mistrustful of SI management. (*Id.* at ¶ 384.) In addition, he claims that he observed a pattern of discrimination against himself and other older employees at Appleton, and believed that he would be fired. (*Id.* at ¶¶ 385–386.) Mr. Coxhill informed others in the company, including Mr. Danielson, Mr. Brock, and Mr. Bandholz, that he believed that he was being discriminated against on the basis of age and that his demotion was the result of age discrimination. (*Id.* at ¶ 387.) While on a business trip in France in July of 1991, Mr. Coxhill was told by Arvid Svensson, one of the managers of engineering for SIAB in Sweden, that he was sorry to have heard that Mr. Coxhill lost his position and that he had been aware of the change since November of 1990, when he and other SIAB managers had been told by Mr. Guernsey that he was going to "give Major a rest" by replacing him with Mr. Quinn. (*Id.* at ¶¶ 388–391; Def. Proposed Findings of Fact ¶ 165.) According to Mr. Coxhill, this reinforced his view that Mr. Guernsey wanted him to retire all along, and that he was being discriminated against on the basis of his age. (Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 391–392.)

After Mr. Spoonamore was fired in June of 1991, Mr. Coxhill was asked to take on additional responsibilities as Field Service Manager. (*Id.* at ¶ 393; Def. Proposed Findings of Fact ¶ 158.) Mr. Valitchka indicated to Mr. Coxhill several times that someone with his skills was needed in the position. (*Id.* at ¶ 159.) According to Mr. Coxhill, this position would have further removed him from engineering activities, would not have allowed him to utilize his experience and expertise as an engineer, and would have taken him further away from the management track of the company; therefore, he denied the request. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 393.) In October of 1991, Mr. Coxhill met with Mr. Guernsey and was again asked to consider the position of Field Service Manager; he viewed this as another demotion, but nevertheless accepted the job. (*Id.* at ¶ 394–395, 404–406; Def. Proposed Findings of Fact ¶ 160.) The parties dispute whether Mr. Coxhill remained in his previous position as Chief Engineer of Product Quality. (*Id.* at ¶ 160; Pl. Resp. to Def. Proposed Findings of Fact ¶ 396–397.) Mr. Coxhill was told that he would be reporting directly to Mr. Valitchka. (*Id.* at ¶ 399.)

On January 1, 1992, SI again reorganized its Appleton unit, and Mr. Coxhill began reporting to Mr. Quinn. (*Id.* at ¶¶ 400–401; Def. Proposed Findings of Fact ¶ 161.) Mr. Quinn had a reputation at SI for abusive behavior, and had previously been abusive towards Mr. Coxhill; Mr. Coxhill did not want to work with or report to Mr. Quinn because he considered Mr. Quinn's conduct to be unprofessional, even though he recalls only one incident where Mr. Quinn used abusive language towards him. (*Id.* at ¶ 163; Pl. Resp. to Def. Proposed Findings of Fact ¶¶ 402–403.) According to Mr. Coxhill, his role and responsibility at SI continued to diminish, and any efforts on his part to become involved in engineering or management would be futile. (*Id.* at ¶ 408.)

During 1990 and 1991, Mr. Coxhill witnessed the termination or departure of senior managers or employees who had been his colleagues and had been employed by SI or its predecessors for many years, including Mr. Weiss, Mr. Flavel, Mr. Gregor, Mr. Conradt, Mr. Bandholz, and Mr. Danielson. (*Id.* at ¶ 407.) Mr. Coxhill concluded that SI was

engaged in age discrimination and that such discrimination had been and was being directed against him, and that he may be fired in the future. (*Id.* at ¶ 410.) In May of 1992, Mr. Coxhill advised Mr. Quinn that he was retiring from SI. (*Id.;* Def. Proposed Findings of Fact ¶ 167–168.) Mr. Coxhill did not tell anyone that he was voluntarily retiring, and only indicated that he was leaving SI. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 411, 413.) Mr. Coxhill was sixty-one (61) when he retired, and had worked at SI and its predecessors for almost twenty (20) years. (*Id.* at ¶ 412; Def. Proposed Findings of Fact ¶ 169.) Soon after he had spoken with Mr. Quinn, Mr. Stelter approached Mr. Coxhill and indicated that his departure would leave a big gap in the organization and that he could still change his mind about leaving. (*Id.* at ¶ 170.) In August of 1992, a retirement party was held for Mr. Coxhill. (*Id.* at ¶ 171; Pl. Resp. to Def. Proposed Findings of Fact ¶ 412.)

During his employment at SI, Mr. Coxhill complained about the employment actions that were being taken, objected to what he perceived to be age discrimination, and objected to his job changes. (*Id.* at ¶ 414.) He did not, however, tell anyone that he was being forced to retire. (Def. Proposed Findings of Fact ¶ 172.) Since leaving SI, Mr. Coxhill has been actively seeking other employment. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 415.) He did not file a charge of discrimination with the EEOC. (Def. Proposed Findings of Fact ¶ 174.)

### 6. *James Conradt:*

Plaintiff James Conradt was born on February 19, 1937. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 416.) He started with Allis–Chalmers in Appleton in 1958 as an employee in the accounting department; he transferred to human resources, where he was employed from 1972 to 1990. (*Id.* at ¶ 417.) In 1986, he was promoted to Manager of Human Resources for the Appleton unit, a senior management position with "first report" responsibility to the general manager; he remained in this position when Mr. Guernsey arrived in November of 1989. (*Id.* at ¶ 418; Def. Proposed Findings of Fact ¶¶ 175–176.) In this position, Mr. Conradt participated in senior staff management meetings and was responsible for formulating and implementing human resources and employment policies and practices for the Appleton unit. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 419.) He also negotiated union contracts and maintained compliance with state and federal laws and regulations. (*Id.*)

After the Appleton and Milwaukee facilities were acquired by SIAB from Allis–Chalmers, Mr. Conradt began to observe things which indicated to him that SIAB had employment practices that discriminated against older workers and favored younger workers. (*Id.* at ¶ 420–421.) Mr. Conradt reviewed the annual statement of Trelleborg AB, the predecessor of SIAB, and observed that the document contained the ages of directors and senior managers; he also observed that many of the managers were in their early or mid thirties. (*Id.* at ¶ 422.) He received information about SIAB's employment policies and practices in 1989 and 1990 from Bruce Merten, who was then the human resources manager for the Milwaukee unit and SI. (*Id.* at ¶ 423.) Mr. Merten and Mr. Conradt communicated regularly about human resources issues, policies and practices; they discussed Swedish management's emphasis on the age of its employees, and the favoring of younger employees over older ones. (*Id.* at ¶ 424.) According to Mr. Conradt, Mr. Merten told him directly that Swedish management had a policy favoring younger workers. (*Id.* at ¶ 425.) Mr. Gregor told Mr. Conradt that, during his interview in Sweden for the general manager position at Appleton, he was told that SIAB wanted to hire someone young, preferably in his thirties. (*Id.* at ¶ 426.) Mr. Merten also purportedly told him that another candidate for that position had been rejected because he was too old. (*Id.* at ¶ 427.) Mr. Guernsey, age thirty-seven (37), was eventually hired; the three candidates recommended by Mr. Farnsworth, Mr. Gregor, age forty-five (45), Mr. Weiss, age fifty-four (54), and Mr. Foy, age forty-eight (48), were not selected. (*Id.* at ¶ 428.)

Mr. Guernsey implemented several practices and procedures that were different from

those utilized by Mr. Farnsworth; Mr. Conradt was not comfortable with Mr. Guernsey's style and believed him to be a poor communicator, as he did not consult Mr. Conradt or involve him in certain decisions to the extent he desired. (Def. Proposed Findings of Fact ¶¶ 177–178, 181.) In the fall of 1989, Mr. Merten instructed Mr. Conradt to calculate the average age of the salaried employees at the Appleton unit; Mr. Conradt had never before been asked to conduct this type of calculation, and was concerned that the information may be used inappropriately. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 429.) In late 1989, Mr. Conradt became aware, as a result of discussions with Mr. Merten, that SI was going to conduct a management conference at a conference center near Chicago. (*Id.* at ¶ 430.) According to Mr. Conradt, he was told that this conference was only for the "young" and up and coming managers, and he was aware that the age of SI employees had been a factor in the process of selecting attendees; the only person selected to attend from Appleton was Mr. Quinn, a young manager in his thirties. (*Id.* at ¶¶ 430–431.)

Mr. Guernsey asked Mr. Conradt to investigate the possibility of having certain Appleton employees attend MBA classes at a college near Appleton. (*Id.* at ¶ 432.) Later, Mr. Guernsey indicated that the only two people he was considering for the program were Mr. Quinn and Mark Geyer, both in their thirties. (*Id.* at ¶¶ 432–433.) In December of 1989, Mr. Conradt prepared a list of employees who were sixty (60) or older, identified as employees who were potentially going to retire; Mr. Conradt had gathered such information in previous years. (*Id.* at ¶ 434.) According to Mr. Conradt, Mr. Guernsey used the list to ask senior managers to specifically find out when those individuals planned to retire; he believed that this use departed substantially from the use to which this information had been put in the past by Mr. Farnsworth, and that it was used to pressure older employees to leave the company. (*Id.* at ¶¶ 435–436.) On December 15, 1989, after Mr. Conradt had provided Mr. Guernsey with information regarding employees' names and ages, Mr. Guernsey told him that "we've got an awful lot of long

service employees. We need to get some young—ah, new blood into the organization." (*Id.* at ¶ 437.) Mr. Conradt made a handwritten note of the conversation to record verbatim Mr. Guernsey's statement, and believed that Mr. Guernsey intended to get rid of long-term employees, including himself. (*Id.* at ¶ 438, 448.)

In February of 1990, after being involved in several meetings, Mr. Conradt was informed by Mr. Guernsey that SI was going to terminate Mr. Weiss. (*Id.* at ¶ 439; Def. Proposed Findings of Fact ¶ 182.) Mr. Guernsey indicated to Mr. Conradt, and then to Mr. Weiss, that Mr. Weiss was being terminated because "he doesn't fit in." (*Id.* at ¶ 183.) Mr. Conradt was aware that Mr. Weiss had not received any negative performance reviews and that his performance had not been formally reviewed by Mr. Guernsey. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 440.) Mr. Conradt believed this action to be the implementation of a program to get rid of older, longer term employees. (*Id.* at ¶ 441.) In a meeting with Mr. Guernsey, Mr. Conradt stated that the termination of Mr. Weiss was a terrible mistake, was discriminatory, and was wrong. (*Id.* at ¶ 442; Def. Proposed Findings of Fact ¶ 186.) Mr. Guernsey purportedly responded "I've decided to terminate him and you have two choices, you do as I tell you or there is the door." (*Id.* at ¶ 187; Pl. Resp. to Def. Proposed Findings of Fact ¶ 443.) Mr. Guernsey did not indicate to Mr. Conradt that older employees did not fit in, or that Mr. Weiss was (or was not) terminated because of his age. (*Id.* at ¶ 444; Def. Proposed Findings of Fact ¶¶ 184–185.) Prior to the day Mr. Weiss was terminated, Mr. Conradt attended a meeting with Mr. Guernsey and an out-placement consultant who was retained by SI to provide employment counseling for Mr. Weiss after the termination; during this meeting, Mr. Guernsey stated that the company was concerned that the termination of Mr. Weiss would result in some type of legal action or age discrimination claim, and the outplacement consultant promised to strongly advise Mr. Weiss against filing a lawsuit. (Pl. Resp. to Def. Proposed Findings of Fact ¶ 445.)

Mr. Conradt was concerned in early 1990 that he would be terminated as a result of his age. (*Id.* at ¶¶ 449, 453.) In December of 1989, Mr. Conradt was given incorrect information pertaining to a benefits presentation for employees at SI plants in Pennsylvania and Kansas; as a result, he told several hundred employees at the facilities the wrong information about their benefits. (*Id.* at ¶ 451.) Mr. Guernsey reprimanded him, telling him it was his responsibility to know that the information was wrong even though it was provided by Mr. Merten. (*Id.*) In February of 1990, Mr. Guernsey criticized Mr. Conradt for negotiating union contracts previously approved by Mr. Farnsworth. (*Id.* at ¶ 450.) According to Mr. Conradt, his job responsibilities were being downgraded and reduced as of early 1990. (*Id.* at ¶ 452; Def.Proposed Findings of Fact ¶ 179.) While the defendants claim that Mr. Conradt only told Mr. Guernsey about this belief, the plaintiffs indicate that he complained to Mr. Merten. (*Id.* at ¶ 180; Pl.Resp. to Def.Proposed Findings of Fact ¶ 455.) Mr. Guernsey expressed dissatisfaction with Mr. Conradt's performance and was actively seeking a replacement for him. (*Id.* at ¶ 454.) According to Mr. Conradt, he was also concerned about being forced to participate in "illegal and immoral" employment discrimination policies involving Mr. Weiss and other older employees, and feared personal liability for carrying out such policies despite his objections. (*Id.* at ¶¶ 455–459.)

Mr. Conradt decided to leave SI shortly after Mr. Weiss was terminated; at the end of March of 1990, he gave notice of his intention to leave the company. (Def.Proposed Findings of Fact ¶¶ 188, 190.) Mr. Conradt did not tell co-workers that he was voluntarily leaving his employment with SI. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 460.) Mr. Conradt felt he had no choice but to leave SI, even though he enjoyed his work and wanted to continue his employment; however, he acknowledges that he was not fired. (*Id.* at ¶¶ 459, 461; Def.Proposed Findings of Fact ¶ 191.) When Mr. Guernsey asked him why he was retiring, Mr. Conradt did not tell him that he was the victim of age discrimination. (*Id.* at ¶ 192.) Mr. Conradt was fifty-three (53) years of age

when he left his employment at SI; he was replaced by Mr. Stelter, age thirty-nine (39). (Pl.Resp. to Def.Proposed Findings of Fact ¶¶ 462–463.) Mr. Conradt was given a retirement party which was attended by about seventy-five (75) people. (Def.Proposed Findings of Fact ¶ 193.) At the time he made the decision to leave SI, Mr. Conradt anticipated receiving an inheritance under his father's will; he did not know the amount, which totalled approximately $300,000. (*Id.* at ¶ 189; Pl.Resp. to Def.Proposed Findings of Fact ¶ 464.)

Mr. Conradt did not file a charge of discrimination with the EEOC. (Def.Proposed Findings of Fact ¶ 195.) While the defendants claim that he never informed any government agency that SI was engaging in discriminatory practices, the plaintiffs indicate that he did so on December 5, 1991. (*Id.* at ¶ 194; Pl.Resp. to Def.Proposed Findings of Fact ¶ 466.) Mr. Conradt indicates that he did not leave his employment with SI to engage in church work or missionary work. (*Id.* at ¶ 465.) Since leaving SI, he has sought employment as a human resources specialist; when no such employment ensued, he started his own woodworking business. (*Id.*)

## II. *LEGAL STANDARD*

 Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schaf-*

*er*, 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14; *Santiago*, 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). This standard is "applied with extra rigor in employment discrimination cases, where intent and credibility are crucial issues." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992). A plaintiff's presentation of more than a scintilla of evidence supporting the existence of an illegitimate motive is enough to preclude summary judgment on an ADEA claim. *Visser v. Packer Eng'g Assoc.*, 909 F.2d 959, 961–62 (7th Cir.1990).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Local 1545*, 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Local 1545*, 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990); *Local 1545*, 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in the light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago*, 894 F.2d at 221. A court need not draw every inference from the record, only reasonable inferences. *Local 1545*, 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989).

## III. DISCUSSION

### A. PARTIES' ARGUMENTS:

#### 1. Plaintiffs Ronald Weiss, Malcolm Flavel and Richard Spoonamore:

The defendants argue that, to prevail on their ADEA claim, each plaintiff must show that SI would not have fired him "but for" the motive to discriminate on the basis of age. According to the defendants, "[t]he undisputed facts in this case demonstrate that age had nothing to do with any of these three involuntary terminations." They contend that Mr. Weiss, age fifty-four (54), was terminated in early 1990 because Mr. Guernsey found his performance, including his purported inability to embrace TQM principles, to be unacceptable; he was replaced by Mr. Dircks, a forty-nine (49) year old former colleague of Mr. Guernsey's at Consolidated Diesel. The defendants also indicate that, although Mr. Guernsey was not entirely satisfied with Mr. Flavel's performance, he was terminated in late 1990 because the decision was made to eliminate his position by assigning international marketing functions to Minco International AB ("Minco"), SIAB's foreign subsidiary, and to eliminate funding for comminution research in Appleton. Finally, they argue that Mr. Spoonamore "quit his managerial position after not getting a raise due to his resistance to the new management [TQM] philosophy," and was later terminated in spring of 1991 for failure to follow orders regarding cost assessment in a start-up project in Mexico. These reasons, the defendants contend, preclude Mr. Weiss, Mr. Flavel, and Mr. Spoonamore from meeting the "but for" test.

The plaintiffs respond that the defendants inappropriately limit their discussion to the *McDonnell Douglas* analytical framework applicable to individual discrimination claims involving indirect proof, ignoring the direct evidence indicating a "pattern or practice" of discrimination in this matter. According to the plaintiffs, contrary to the *McDonnell Douglas* approach, "[e]vidence supporting a pattern or practice claim shifts both the burdens of production and persuasion to the employer." They further argue that direct evidence of age discrimination against Mr. Weiss, Mr. Flavel, and Mr. Spoonamore renders the "mixed motives" analysis, rather than *McDonnell Douglas* framework, applicable to their individual discrimination claims; under this approach, a grant of summary judgment is normally not appropriate. Finally, the plaintiffs claim that Mr. Weiss, Mr. Flavel, and Mr. Spoonamore nevertheless have established a prima facie case under *McDonnell Douglas* and have raised significant issues of material fact with respect to the true reasons for the terminations. According to the plaintiffs, Mr. Weiss was terminated despite a long history of solid performance due to a companywide policy of age discrimination emanating from SIAB through Mr. Platner and Mr. Guernsey; they claim that SI's explanation for his termination has changed several times since the filing of this lawsuit. They also claim that SI has been changing its explanation for Mr. Flavel's termination, and that another younger application engineer was hired after Mr. Flavel was fired. Finally, they argue that Mr. Guernsey referred to Mr. Spoonamore as being "too damn old" and suggested that he be replaced with a younger person, and that the reasons given by SI for his termination are pretextual.

### 2. *Plaintiff Robert Van Dyke:*

The defendants claim that Mr. Van Dyke cannot establish a prima facie case of age discrimination because no employee outside the protected class was treated more favorably than him. They indicate that, when Mr. Van Dyke became the on-site manager of SI's Stansteel operation in Los Angeles, he was responsible for overseeing the entire business group including engineering, parts sales, quality assurance, sales, contract administration and field service; in November of 1988, most of these functions were transferred to the Milwaukee facility, with Mr. Van Dyke reporting to Mr. Faulkner, age fifty-two (52). According to the defendants, Mr. Faulkner became concerned about several customer complaints relating to Mr. Van Dyke and Stansteel, and considered the amount of Stansteel's outstanding holdbacks to be too high. The defendants claim that, "[a]fter the Stansteel operation continued to show disappointing results during 1989," further consolidation occurred; Dr. Joung decided that an on-site manager was no longer needed at Stansteel, and Mr. Van Dyke was terminated in January of 1990. Four employees remained at Stansteel, each over the age of fifty (50). Furthermore, the defendants claim that, even if Mr. Van Dyke can establish a prima facie case, he cannot prove that these reasons are a pretext for discrimination.

The plaintiffs again respond that the defendants are ignoring the fact that, in a pattern or practice discrimination involving direct evidence, the three-part *McDonnell Douglas* framework is inapplicable, and the defendants, rather than the plaintiffs, bear the burden of establishing that Mr. Van Dyke was fired for a legitimate purpose after the plaintiffs establish their prima facie case. The plaintiffs further argue that there is abundant direct evidence that Mr. Van Dyke's performance was exemplary, that SI was engaged in an effort to reduce the average age of its workforce, and that SI's alleged reasons for firing Mr. Van Dyke were, in fact, pretextual. For example, Dr. Joung purportedly acknowledged in his 1990–91 business plan that he had made progress in meeting the company's goal of filling positions "with younger people as much as possible," and wrote notes asking whether Stansteel's employees were "too old." The plaintiffs further claim that SI's explanations for Mr. Van Dyke's termination have changed since filing of this lawsuit. Finally, the plaintiffs indicate that, under *Kralman v. Illinois Dept. of Veterans Affairs,* 23 F.3d 150 (7th Cir.1994), "the Seventh Circuit held that a *prima facie* case of age discrimination can be

**1458**

established where an employer has replaced one over–40 worker with another."

### 3. *Plaintiffs alleging constructive discharge:*

The defendants claim that the undisputed facts reveal that Mr. Smay, Mr. Meagher, Mr. Isferding, Mr. Jones, Mr. Conradt, and Mr. Coxhill were neither the victims of age discrimination nor constructively discharged. They assert that Mr. Smay, a district sales manager at Appleton, retired in May of 1992 after clashing with Mr. Valitchka, being criticized for low sales volume, and having his sales territory reassigned; he purportedly made no statement about being the victim of age discrimination. Mr. Meagher, also a district sales manager at Appleton, retired after being told that Mr. Guernsey viewed his sales performance as poor and after telling Mr. Gregor that he had planned on retiring in March of 1992 on his sixty-fifth (65) birthday. Mr. Isferding, a senior application and project engineer at Appleton, retired in October of 1991 after being verbally abused by Mr. Quinn on at least two occasions and being transferred to the parts department; again, he purportedly made no statement about being the victim of age discrimination. Robert Jones, also a senior project and application engineer, retired in May of 1991 after being verbally abused by Mr. Quinn with some regularity and notifying management that he wished to pursue other interests and to work as a consultant at a later time; after filing a charge of discrimination with the EEOC, he reportedly declined an offer of reinstatement. Mr. Coxhill was the Manager of Engineering at Appleton when Mr. Guernsey was hired; he retired in July of 1992 after being transferred to the position of Chief Engineer of Product Quality and being verbally abused by Mr. Quinn on at least one occasion. He purportedly made no statement about being the victim of age discrimination. Finally, Mr. Conradt, the Manager of Employee and Community Relations at Appleton, retired in March of 1990 after disagreeing with Mr. Guernsey over management style, performance reviews, and the termination of Mr. Weiss; again, he purportedly made no statement about being the victim of age discrimination. Based on these facts, the defendants claim that none of the six plaintiffs can prove constructive discharge by demonstrating that he (1) suffered a materially adverse employment action, (2) incurred a work environment that was so intolerable that a reasonable person would feel compelled to quit, and (3) sought redress while still employed.

The plaintiffs respond that each of these plaintiffs were targets of SI's pattern of age discrimination, which was implemented in this country shortly after SIAB's acquisition of Allis–Chalmers in 1989 through Mr. Guernsey. According to the plaintiffs, Mr. Guernsey and other senior managers were hired based on age-based criteria, and Mr. Guernsey told several of his managers that younger employees were needed and implemented a scheme to rid SI of older employees. The plaintiffs claim that Mr. Meagher and Mr. Smay only retired, despite years of exemplary performance, after hearing of Mr. Guernsey's contempt for older employees (including specific references to Mr. Meagher), having grossly inflated and clearly unattainable sales goals thrust upon them, and being subjected to demeaning performance reviews and trumped-up job descriptions. They also assert that, in conformity with Mr. Guernsey's expressed sentiments regarding older employees, Mr. Quinn targeted Mr. Jones and Mr. Isferding, despite their respective histories of satisfactory performance, through verbal abuse, physical intimidation, public humiliation, and adverse treatment which lasted until each announced his retirement. The plaintiffs further argue that Mr. Guernsey, when removing Mr. Coxhill from the position of Manager of Engineering, made very clear his intention that Mr. Coxhill retire despite his years of solid performance, and only reassigned him to the "concocted" position of chief engineer, with little authority, to "warehouse" him after he voiced his shock and disapproval; in that position, he was placed under the authority of Mr. Quinn, whose abusive style was well-known. Finally, they indicate that Mr. Conradt resigned only after (1) witnessing SI's plan of age discrimination, (2) "repeatedly observing Guernsey implement Svedala's plan of age discrimination, over his objection" in the termination of Mr. Weiss, (3) being threatened

with termination "if he failed to support plainly age-based actions taken by Guernsey," and (4) having his own job responsibilities downgraded and being subjected to unfair criticism by Mr. Guernsey.

**B. LEGAL FRAMEWORK:**

1. *Individual Discrimination Claims:*

 Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer ... to discharge [ ] or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In discrimination cases where the disparate treatment of a single employee is at issue, *see, e.g., Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994) (race discrimination case under Title VII), "[a] plaintiff may prove age discrimination in one of two different ways"; she may either produce direct or circumstantial evidence that age was the determining factor in her discharge, or, "as is more common, she may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted to age discrimination claims under the ADEA." *Anderson v. Baxter HealthCare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1993) (citing *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir.1992). Direct evidence of discrimination, of course, includes any acknowledgement by the defendant that discriminatory intent was behind its treatment of the plaintiff; circumstantial evidence, in turn, may involve, *inter alia,* proof of suspicious timing, ambiguous statements and behavior, inappropriate remarks, and "comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic." *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir.1994) (gender discrimination case under Title VII). *Accord Troupe v. The May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (gender discrimination case under Title VII).

 Under the burden shifting approach of *McDonnell Douglas,*

"the plaintiff must initially establish a prima facie case of discrimination. In order to establish a prima facie case, the plaintiff must show: (1) she was a member of the protected class (age 40 or over), (2) she was doing the job well enough to meet her employer's legitimate expectations, (3) she was discharged or demoted, and (4) the employer sought a replacement for her. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993).

If the plaintiff succeeds in establishing a prima facie case, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for age discrimination. *Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 426–27 (7th Cir.1989)."

*Anderson,* 13 F.3d at 1122. If the plaintiff successfully shows that the employer has offered "a pretext—a phony reason—for why it fired the employee, then the trier of fact is permitted, although not compelled, to infer that the real reason was age." *Visser v. Packer Eng'g Ass'n, Inc.,* 924 F.2d 655, 657 (7th Cir.1991) (en banc) (citing *Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990)). *Accord Anderson,* 13 F.3d at 1122–24. However, because " 'the ultimate burden' of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff ... the plaintiff might be well advised to present additional evidence of discrimination, because the factfinder is not *required* to find in her favor simply because she establishes a prima facie case and shows that the employer's proffered reasons are false." *Anderson,* 13 F.3d at 1124 (citing *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993)). For summary judgment purposes, a non-moving plaintiff must only "produce evidence from which a rational factfinder could infer that [her employer] lied" about its proffered reasons for

dismissal. *Anderson*, 13 F.3d at 1124; *Shager*, 913 F.2d at 401.

### 2. *Pattern or Practice Discrimination Claims:*

 An analogous analytical framework applies to an ADEA representative action brought by either the EEOC or an individual plaintiff alleging a pattern or practice of disparate treatment. *See, e.g., Coates v. Johnson & Johnson*, 756 F.2d 524, 531 (7th Cir.1985) (race discrimination case under Title VII). In the Seventh Circuit, "[p]laintiffs who raise a pattern or practice class claim have as their initial burden the task of demonstrating that unlawful discrimination has been the regular policy of the employer, *i.e.*, that 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Coates*, 756 F.2d at 532 (*quoting International Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1854–55, 52 L.Ed.2d 396 (1977)). Again, such plaintiffs meet their burden by either producing direct or circumstantial evidence that their employer effectuated a pattern of discriminatory age-based decisionmaking, or utilizing a burden-shifting method of proof similar to that articulated in *McDonnell Douglas.*

 Under the burden-shifting approach, pattern or practice discrimination actions are generally bifurcated at trial into two parts; a liability, or *prima facie* phase, where the plaintiffs must prove discriminatory policy by a preponderance of the evidence, and a remedial phase, where the scope of relief awardable to each individual plaintiff is litigated. *Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977); *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984); *In re W. Dist. Xerox Litigation*, 850 F.Supp. 1079, 1081–82 (W.D.N.Y.1994); *Forehand v. Florida State Hosp. at Chattahoochee*, 839 F.Supp. 807, 813 (N.D.Fla.1993). Under this procedure, efficiency is best enhanced if the same jury makes liability and remedial factual findings, as (1) the plaintiffs need not reintroduce in the remedial phase anecdotal evidence already presented during the liability phase, (2) the defendants need not re-introduce in the remedial phase defenses already presented in the liability phase, and (3) conflicting discrimination findings as to plaintiffs whose cases are litigated in the liability phase are avoided.

#### a. *Liability phase:*

##### 1) *Plaintiffs' proof:*

 In the liability, or *prima facie* phase, of trial, the plaintiffs "have as their initial burden the task of demonstrating that unlawful discrimination has been the regular policy of the employer, *i.e.*, that 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Coates*, 756 F.2d at 532 (*quoting Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1854–55). *Accord King v. General Elec. Co.*, 960 F.2d 617, 623 (7th Cir.1992); *Forehand*, 839 F.Supp. at 813. A formal written policy is not required to establish such a pattern or practice; an informal or unstructured method of decision-making may be sufficient to invoke this doctrine. *See Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760–61 (9th Cir.1980); *Glass v. IDS Fin. Serv., Inc.*, 778 F.Supp. 1029, 1052 (D.Minn.1991). At this stage, the plaintiffs need not "offer evidence that each person for whom [they] will ultimately seek relief was a victim of the employer's discriminatory policy. [Their] burden is to establish a *prima facie* case that such a policy existed." *Teamsters*, 431 U.S. at 360, 97 S.Ct. at 1867. *Accord Xerox*, 850 F.Supp. at 1081.

 In establishing their *prima facie* case, the plaintiffs should produce "statistical evidence demonstrating substantial disparities in the application of employment actions as to [the protected] and the unprotected group, buttressed by [anecdotal] evidence of general policies or specific instances of discrimination." *Coates*, 756 F.2d at 532.[2]

---

**2.** This is not to say, however, that "the absence of statistical evidence must invariably prove fatal in every pattern or practice case. Where the overall number of employees is small, anecdotal evidence may suffice." *Xerox*, 850 F.Supp. at 1084. *Accord Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1268 (10th Cir.1988); *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir.1984). In other

Where the plaintiff class is prohibitively large for each plaintiff to provide individual testimony of alleged discriminatory conduct, plaintiffs regularly present anecdotal testimony from a subset of plaintiffs in seeking to establish their *prima facie* case. *See, e.g., Teamsters,* 431 U.S. at 338, 357, 97 S.Ct. at 1855–56, 1865–66 (*prima facie* case met where plaintiff class of over three-hundred employees provided specific evidence of company-wide discrimination against only forty plaintiffs); *King,* 960 F.2d at 619 (*prima facie* case not met where plaintiff class of fifteen employees provided testimony of six such employees in support of pattern or practice claim); *Chisholm v. United States Postal Serv.,* 665 F.2d 482, 495 (4th Cir.1981) (*prima facie* case met where plaintiffs provided testimony of subset of twenty plaintiffs in support of discrimination claim). Anecdotal evidence must suggest broad-based discrimination, however, as providing mere "isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination." *King,* 960 F.2d at 622. *See also Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1854–55; *Forehand,* 839 F.Supp. at 813.

### 2) *Defendants' rebuttal:*

■■■■■ During the liability, or *prima facie,* stage of proceedings, the defendants may, of course, counter the plaintiffs' proof through cross-examination and the presentation of rebuttal evidence, both statistical and anecdotal, in an "attempt to show that the plaintiff's 'proof is either inaccurate or insignificant.'" *Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir.1984) (*quoting Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867). *See also Coates,* 756 F.2d at 532.[3] The strength of rebuttal evidence that the defen-

dants must produce "to prevent the plaintiff[s] from carrying the burden of persuasion as to disparity [in treatment among employee groups] depends, as in any case, on the strength of the plaintiffs' proof." *Coates,* 756 F.2d at 532 (*quoting Segar v. Smith,* 738 F.2d 1249, 1268 (D.C.Cir.1984)).

■■■■■ As previously indicated, because plaintiffs at this stage generally elicit anecdotal evidence from only a subset of the plaintiff class, defendants in most cases do not provide rebuttal evidence against every named plaintiff; instead, their proof is limited to evidence and testimony which counters the plaintiffs' *prima facie* presentation. As noted in *Teamsters,*

> "[t]he employer's defense must, of course, be designed to meet the prima facie case of the [plaintiffs]. We do not mean to suggest that there are any particular limits of the type of evidence an employer may use. *The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.*"

(Emphasis added). During this stage, then, the defendants' rebuttal evidence is tailored to the plaintiffs' *prima facie* case. *Segar,* 738 F.2d at 1267. While defendants may attempt to establish a nondiscriminatory reason for an adverse employment decision against a testifying plaintiff, *see Coates,* 756 F.2d at 532, they need not do so depending on their assessment of the strength of the plaintiffs' evidence; again, the focus is on the presence or absence of a company-wide discriminatory policy, and not on individual employment decisions.[4] It is only during the second, or remedial, phase of trial that the defendants must establish that individual

---

cases, "a plaintiff's statistical evidence alone might constitute a *prima facie* case." *Coates,* 756 F.2d 532 n. 6 (citing *Segar v. Smith,* 738 F.2d 1249, 1278) (D.C.Cir.1984)). "Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other," *id.* at 533; however, "[w]hen one type of evidence is missing altogether, the other must be correspondingly stronger for plaintiffs to meet their burden." *Xerox,* 850 F.Supp. at 1085.

**3.** "An employer might show, for example, that the claimed discriminatory pattern is a product

of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination." *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867.

**4.** The defendants, for example, may simply question the accuracy of a testifying plaintiffs' recollection, or attempt to show the absence of any age-based references toward that employee.

plaintiffs were not, in fact, victims of the discriminatory practice to escape liability. *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868; *Craik,* 731 F.2d at 470; *Xerox,* 850 F.Supp. at 1081–82; *Forehand,* 839 F.Supp. at 813.

### 3) *Jury determination:*

■■■■■ Throughout this stage of proceedings, the plaintiffs bear the burden of persuasion as to establishing a *prima facie* case of pattern or practice age discrimination. *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867; *King,* 960 F.2d at 623; *Coates,* 756 F.2d at 532; *Xerox,* 850 F.Supp. at 1081–82; *Forehand,* 839 F.Supp. at 813. At the close of the liability phase of trial, the jury is asked through appropriate instructions whether or not the plaintiffs have met their burden of establishing by a preponderance of the evidence that the defendants engaged in a pattern or practice of age discrimination during the relevant time frame. If the jury responds negatively, then trial of the plaintiffs' pattern or practice claim is completed and the plaintiffs are left to pursue individual discrimination claims, presumably before a different factfinder.[5] If, on the other hand, the jury responds affirmatively, the Court may award prospective relief to the plaintiffs as sought by the EEOC. *Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867–68; *Craik,* 731 F.2d at 470. As to the scope of individual relief to which the plaintiffs might be entitled, the Court must move to the second, or remedial, phase of trial. *Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867–68; *Craik,* 731 F.2d at 470; *Forehand,* 839 F.Supp. at 813.

#### b. *Remedial phase:*

■■■ If the plaintiffs prevail in the liability, or *prima facie* phase, of trial, then the proceedings move into the second, or remedial phase, of trial, where "[t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868. Under such circumstances, it is presumed that each individual plaintiff has been the victim of age discrimination at the hands of the defendant. *Cooper,* 467 U.S. at 875, 104 S.Ct. at 2799; *King,* 960 F.2d at 623; *Xerox,* 850 F.Supp. at 1081.

### 1) *Defendants' proof:*

■■■■ This presumption of discrimination shifts to the defendants the burden of demonstrating that the individual plaintiffs were not victims of the discriminatory practice. *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868; *King,* 960 F.2d at 623; *Xerox,* 850 F.Supp. at 1081–82. This includes "not only the burden of production, but also the burden of persuading the trier of fact that it is more likely than not that the employer did not unlawfully discriminate against the individual." *Craik,* 731 F.2d at 470. *Accord King,* 960 F.2d at 623; *Forehand,* 839 F.Supp. at 813.[6] "The *Teamsters* approach thus differs from the traditional *McDonnell Douglas* analysis in that the burden of persuasion can shift from plaintiffs to defendants." *Xerox,* 850 F.Supp. at 1082.

■■■■ To rebut the presumption of discrimination as to each plaintiff, the defen-

---

**5.** The effect of such a determination on the plaintiffs' individual discrimination claims "is to leave the plaintiffs with the burden of proving—without assistance from the pattern and practice evidence—that each actionable [termination] suffered by the plaintiffs was the product of intentional discrimination on the part of the defendants. The plaintiffs, in other words, can neither bolster their individual claims for relief with proof that the defendants engaged in a system-wide practice of racial discrimination, nor can they [ ] shift the burden of proof to the defendants." *Forehand,* 839 F.Supp. at 813.

**6.** Citing *Coates,* 756 F.2d at 532–33 and *Croker v. Boeing Co.,* 662 F.2d 975, 991 (3d Cir.1981), the defendants argue that the burden of persuasion

remains with the plaintiffs throughout both phases of trial. The *Coates* decision, however, is limited to a discussion of the burden of persuasion *during the liability phase of a pattern or practice trial,* and does not directly address the issue of burden shifting during the remedial phase of trial, where a presumption of discrimination exists. *See Coates,* 756 F.2d at 532 (noting that "[n]onetheless, at the liability stage of a pattern or practice suit, the plaintiff always bears the burden of persuasion with respect to discrimination"). *Croker,* on the other hand, is a Third Circuit decision whose efficacy in the Seventh Circuit is questionable after the decision in *King,* 960 F.2d at 623.

dants must establish by a preponderance of the evidence that age discrimination was not a "determining factor" or a "but-for" element in their employment decisions. *See Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993); *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1243 (7th Cir.1992). In attempting to meet this burden, the defendants may again present evidence demonstrating that the plaintiffs' "proof is either inaccurate or insignificant," *Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867–68; *Coates,* 756 F.2d at 532; *Craik,* 731 F.2d at 470, or that a nondiscriminatory explanation exists for the presumed discriminatory termination of each plaintiff. *See Coates,* 756 F.2d at 532. The amount of damages awardable to each plaintiff is also litigated during this phase of trial. *See Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867–68; *Craik,* 731 F.2d at 470; *Forehand,* 839 F.Supp. at 813.

### 2) *Plaintiffs' rebuttal:*

 During the remedial stage of proceedings, the plaintiffs may, of course, counter the defendants' proof through cross-examination and the presentation of rebuttal evidence in an attempt to show that the defendants' non-discriminatory justifications for their employment decisions are merely a pretext for discrimination. *See, e.g., Sarsha,* 3 F.3d at 1039; *Fisher,* 979 F.2d at 1243. As a general rule, "[p]retext may be established directly with evidence that [the defendant] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Sarsha,* 3 F.3d at 1039. As previously indicated, however, unlike in the *McDonnell Douglas* format applied to individual discrimination claims, the *Teamsters* model imposes no burden on the plaintiffs to produce such evidence, and the burden of persuading the factfinder that age discrimination was not a determining factor in each of the defendants' employment decisions remains with the defendant. *See Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868; *King,* 960 F.2d at 623; *Craik,* 731 F.2d at 470; *Xerox,* 850 F.Supp. at 1081–82. The strength of rebuttal evidence that the plaintiffs must produce to prevent the defendants from carrying their burden of persuasion again will depend, as in any case, on the strength of the defendants' proof. *See Coates,* 756 F.2d at 532 (*quoting Segar v. Smith,* 738 F.2d 1249, 1268 (D.C.Cir.1984)). In addition, the plaintiffs are required to litigate the amount of damages awardable to each named party during this stage of proceedings. *See Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867–68; *Craik,* 731 F.2d at 470; *Forehand,* 839 F.Supp. at 813.

### 3) *Jury determination:*

 At the end of the remedial phase of trial, the jury is asked through appropriate instructions whether the defendants "willfully" violated the Age Discrimination in Employment Act, and whether the defendants have proven by a preponderance of the evidence that each individual plaintiff was not a victim of age discrimination; they are also asked to assess damages for each named plaintiff.

### C. *ANALYSIS:*

 Where individual and class-claims are bought contemporaneously, courts should "consider the evidence relating to the individual claims in [their] assessment of the class claim, and vice-versa, since evidence relevant to one is also relevant to the other." *Coates,* 756 F.2d at 533. The class claim, however, "is to be considered first, since if the class claim has merit, the named and unnamed individual class members are entitled to the burden-shifting presumption of *Teamsters.*" *Id.*

### 1. *Pattern or Practice Discrimination:*

Because the Court finds that a reasonable jury could conclude that the defendants engaged in a pattern or practice of age discrimination, and that this practice was the determining factor, or "but for" cause, for the termination or "retirement" of each plaintiff named in this motion, the defendants' Motion for Summary Judgment must be denied.

### a. *Plaintiffs' prima facie case:*

 Viewing (as we must) the factual submissions of the parties in a light most favorable to the non-movants, it is clear that

the plaintiffs present adequate evidence to establish a *prima facie* case of pattern or practice discrimination by SI against older employees which emanated from its Sweden parent, SIAB. The jury may adopt as true the following factual summary. SIAB and SI had interlocking management structures and had direct, frequent, and substantial contact with one another through business and financial planning arrangements. When Mr. Guernsey was interviewed in Sweden by Mr. Older and Mr. Knuttson for the general manager position at Appleton, they discussed specific personnel in Appleton, including Mr. Weiss. While interviewing for the same position in Sweden, Mr. Gregor was told that SI was "looking for a guy in his late 30's." Dr. Joung and Mr. Soriano, after returning from a conference for senior managers in Sweden, reported that Swedish management was concerned about the high average age of the workforce at the Milwaukee facility, and wanted action taken to bring in younger workers. Mr. Soriano also stated that, while SIAB management believed that Milwaukee had a problem with older workers, it found the "age problem" at Appleton to be even worse. Written business plans submitted to SIAB by Dr. Joung noted the "high average age" of SI's employees as a "principal weakness" of the Milwaukee unit, and indicated that a program had been initiated to fill position with younger people, thereby decreasing the average age of employees.

Mr. Conradt, the Manager of Human Resources at the Appleton unit, and Mr. Merten shared a mutual concern over the perceived "youth cult" being imposed on SI by SIAB management, and Mr. Merten told Mr. Conradt that SI had a policy which favored younger workers over older employees. Mr. Merten also told Mr. Conradt "off the record" that an applicant for the Appleton General Manager job had been rejected because he was "too old." SI retained a professional executive search firm in its general manager search; Mr. Platner and Mr. Knuttson informed the firm that (1) the Appleton business unit had been populated by "people who had been in the business 30 years or more, and the message was we need to get new and different thinking and leadership that in looking toward the future that isn't just a

prologue to the past," and (2) in conducting the general manager search, SIAB wanted to avoid "calcified" candidates. The youngest of the ten finalists selected by the search firm, Mr. Guernsey, age thirty-seven (37), was given the position. Mr. Guernsey maintained regular communication with SIAB management regarding business objectives, planning, personnel issues, and related matters.

Mr. Conradt observed employment policies and practices at SI in 1989 which he found to be discriminatory against older workers. Mr. Conradt was asked by Mr. Merten to calculate the average age of salaried employees at the Appleton facility; he was concerned that this request was part of an overall program to get rid of older workers. As he had done in prior years, he also compiled a list of employees ages sixty (60) and older; after receiving the list, Mr. Guernsey commented that "we've got an awful lot of long service employees. We need to get some young—ah, new blood into the organization." In January of 1990, Mr. Guernsey told Mr. Weiss that "the problem with Appleton is that we have too many old people in their jobs too long." When Mr. Conradt later objected to the termination of Mr. Weiss, Mr. Guernsey responded that he had "two choices, [ ] do as I tell you or there is the door." In February of 1990, Mr. Guernsey conducted his first performance review of Mr. Gregor, establishing written performance objectives including the development of a "young generation of salesmen and manager candidates." Mr. Guernsey told Mr. Gregor that he had calculated the average age of the Appleton sales force to be 55–56 years old, that this number was too high, that they needed to hire a younger and more aggressive sales force, that the current force was "old and stale," and that he was not comfortable working with older employees. On a number of occasions, Mr. Guernsey ordered Mr. Gregor to terminate Mr. Meagher, an "old incompetent" who needed to be replaced with some "young blood." Mr. Guernsey also criticized Mr. Gregor for promoting Mr. Spoonamore, noting that he had a better candidate who was a "very young, professional guy." Mr. Guernsey further in-

structed Mr. Gregor that, if he could not get rid of certain employees, he would have Mr. Stelter find a way to do so.

Only managers in their thirties and forties were selected by SIAB management to attend the Nordic Hills management assessment conference; nominees' job location, name, present title and age were primary factors considered in selection. Mr. Quinn was the only manager from Appleton selected to attend; Mr. Weiss and Mr. Foy were rejected. Mr. Quinn was later promoted to Mr. Coxhill's position of Manager of Engineering. In approximately April of 1991, Mr. Valitchka told Mr. Gregor that SI's program was to reduce the average age of its sales force by bringing in younger employees. In a meeting later that month, Mr. Gregor commented that pictures of equipment on Mr. Quinn's wall included some "real antiques"; Mr. Guernsey responded that he thought Mr. Gregor was referring to Mr. Quinn's sales force. Mr. Quinn's conduct toward subordinates was abusive, especially toward older employees; SI management was aware of his behavior.

There is evidence suggesting that Mr. Valitchka and Mr. Stelter revised the job description for regional sales representatives, adding new physical and endurance demands which were not necessary to the position and were designed to discriminate against older employees with medical conditions, including Mr. Smay, Mr. Meagher, and Mr. Pape. Before he was terminated, Mr. Coxhill was instructed by Mr. Guernsey to present information as to each Appleton engineer's age, date of birth, and years of service. Within two years after Mr. Guernsey arrived at Appleton, at least eleven employees above age fifty were no longer employed at the facility. When Mr. Lenhart was interviewed in Sweden as Mr. Merten's replacement, he was asked for his date of birth, and was told that "in Sweden they have no laws against asking folks for their date of birth." When Mr. Platner selected Mr. Fons as general counsel for SI, he used Mr. Fons' college graduation date to compute his name, which did not appear on his resume. At the Milwaukee unit, applications for employment from older individuals were routinely reject-

ed with handwritten notes emphasizing the applicants' ages.

On February 13, 1991, the Milwaukee facility carried out a reduction-in-force (RIF) which resulted in the termination of twenty (20) employees. Eighteen of these workers were over age forty; one of the two below-forty people released, as well as the youngest of the remaining eighteen employees, were subsequently rehired by SI. Notes from the management meeting preceding the RIF indicate that the age of employees considered for termination was discussed. Most of the employees terminated were fifty years of age or older.

If inadequately rebutted by the defendants, and found to be true by the jury, these facts, coupled with the particular termination decisions made as to each plaintiff, adequately (though not overwhelmingly) establish the adoption of a pattern or practice of age discrimination at SI at the behest of its corporate parent, SIAB. Because a reasonable factfinder could conclude that the plaintiffs have met their *prima facie* case, we presume for the purposes of this motion that the individual plaintiffs are entitled to the burden-shifting presumption of *Teamsters* previously discussed.

#### b. *Defendants' rebuttal:*

A reasonable jury could further conclude that the defendants have not met their burden of establishing that, despite the presumption of age discrimination, age discrimination was not a "but for" cause, or determining factor, in the termination of any of the named plaintiffs.

1) *Plaintiffs Ronald Weiss, Malcolm Flavel and Richard Spoonamore:*

Viewing the evidence in a light most favorable to the plaintiffs, a reasonable jury could conclude that SI's explanations for the termination of Mr. Weiss, Mr. Flavel and Mr. Spoonamore are merely a pretext for age discrimination. As to Mr. Weiss, Appleton's Manager of Manufacturing, the defendants suggest that he was terminated because he did not have in place adequate programs to improve plant safety and reduce quality con-

trol, purchasing, and inventory costs, and resisted Mr. Guernsey's TQM management philosophy. The plaintiffs, however, present evidence that Mr. Weiss had a history of satisfactory performance and had instituted numerous safety measures, including a management safety council, a safety brigade, safety tours, weekly safety programs, safety posters, periodic safety contests and awards, and a full-time nurse. They also indicate that Mr. Platner had eliminated the total quality assurance department at Appleton as a cost-savings measure, reassigning TQM to the engineering department, that Mr. Weiss preserved as much of the TQM program in manufacturing as he could, and that, in the period preceding Mr. Guernsey's arrival, Mr. Weiss was working on a large cost reduction plan. Given these facts, a reasonable factfinder could conclude that SI has not met its burden of establishing by a preponderance of the evidence that Mr. Weiss was not terminated due to his age.

The defendants present evidence that, while his performance was satisfactory, Mr. Flavel was terminated because his international marketing responsibilities were transferred to Minco and funding for his comminution research was eliminated. The plaintiffs, however, indicate that, despite his qualifications, Mr. Flavel was passed over for several open positions at Appleton and Minco. They also indicate that, when initially responding to Mr. Flavel's EEOC charge, the defendants claimed that Mr. Flavel was terminated because comminution research had been transferred to Sweden, and made no mention of decreases in funding or the transfer to Sweden of international marketing functions. Again, the jury could reasonably conclude that SI's proffered explanations are simply a pretext for age discrimination, and that the defendants have not met their burden.

According to the defendants, Mr. Spoonamore was terminated because he resisted the implementation of TQM principles espoused by Mr. Guernsey and had disobeyed Mr. Guernsey's directives on the costs relating to the above-referenced project in Mexico. The plaintiffs, however, indicate that Mr. Spoonamore's performance was "seriously under-

mined" by Mr. Guernsey, Mr. Quinn, and Mr. Dircks, who, *inter alia*, routinely contacted his subordinates without his notification and verbally abused him, including making ageist comments, in front of others. They also assert that Mr. Spoonamore did not resist TQM at Appleton, is conversant with TQM principles, believes that they can be effective, and merely expressed doubts about the applicability of certain specific management strategies to his small department. They also present evidence that Mr. Guernsey was critical of his performance, and denied him a raise, even though he had never conducted a performance review of him or provided written notice of alleged performance deficiencies, and that Mr. Spoonamore followed Mr. Guernsey's instructions on the Mexican project. A reasonable jury may reject the defendants' explanation of Mr. Spoonamore's termination/constructive discharge as pretextual; as a result, their summary judgment motion must be denied as to this plaintiff.

2) *Plaintiff Robert Van Dyke:*

Viewing the evidence in a light most favorable to the plaintiffs, a reasonable jury could conclude that SI's explanation for the termination of Mr. Van Dyke was merely a pretext for age discrimination. According to the defendants, Mr. Van Dyke was dismissed after his responsibility for resolving holdbacks on certain equipment contracts was transferred to Milwaukee in response to customer complaints and after further consolidation of the Stansteel operation with the Milwaukee facility obviated the need for an on-site manager at Stansteel. They also indicate that Mr. Faulkner harbored serious concerns about Mr. Van Dyke's performance, and that sales volume at Stansteel had steadily declined. The plaintiffs, on the other hand, claim that Mr. Van Dyke was not notified as to concerns over his performance, that he received a 7.1% merit pay increase in August of 1989, and that he never received any performance appraisals after 1984. They also indicate that the termination letter handed to Mr. Van Dyke by Mr. Faulkner did not mention performance problems as a cause for termination, and that SI retained a younger employee at the Stansteel operation who had a history of performance deficiencies. The plaintiffs also contend that Stan-

steel had a reasonable backlog of business when Mr. Van Dyke was terminated, and good prospects for future business.

In our view, a jury assessing this evidence is likely to conclude that the defendants have met their burden of establishing that Mr. Van Dyke was terminated for just cause, namely, a decrease in sales volume and consolidation of managerial functions to the Milwaukee facility. Nevertheless, we are unable to find that a reasonable jury could not make a contrary determination. Mr. Van Dyke may, for example, convince the jury that business prospects at Stansteel were, in fact, good, or that the decision to terminate him rather than the previously-referenced younger Stansteel employee was based, at least in part, on age. Accepting either proposition, the jury may conclude that the defendants' proffered justifications are merely a pretext for age discrimination. Again, the defendants' summary judgment request must be denied.

### 3) *Plaintiffs alleging constructive discharge:*

■■■ Viewing the evidence in a light most favorable to the plaintiffs, a reasonable jury could conclude that SI's explanations for the "retirements" of Mr. Meagher, Mr. Smay, Mr. Jones, Mr. Isferding, Mr. Coxhill, and Mr. Conradt are merely a pretext for age discrimination. In the Seventh Circuit, "[d]emonstrating constructive discharge requires a showing that 'a reasonable employee would have felt compelled to resign under the circumstances of the case.'" *Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994) (*quoting Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 677 (7th Cir.1993)). A constructive discharge involves more than a mere inconvenience or an alteration of job responsibilities; it is instead established by indicating "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat. Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993).

According to the defendants, Mr. Smay voluntarily retired because he was unhappy with his performance review and the recon-figuration of his sales territory, and wished to "look after some personal investments." The plaintiffs, on the other hand, indicate that Mr. Smay was constructively discharged only after (1) Mr. Gregor was pressured into reducing the average age of his workforce and was replaced by Mr. Valitchka, (2) SI imposed an inflated sales quota on him during a recessionary year, and unduly criticized his performance, and (3) mindful of Mr. Smay's medical condition, Mr. Stelter created a "new" job description for district sales managers which included "trumped up" physical requirements. Given these facts, a reasonable factfinder could conclude that SI has not met its burden of establishing by a preponderance of the evidence that Mr. Smay was not constructively discharged due to his age.

The jury may reach a similar conclusion regarding Mr. Meagher. The defendants assert that Mr. Meagher voluntarily retired at age sixty-five (65), as he had planned, after his sales performance had been criticized as subpar, and that he encouraged a colleague to apply for his position. The plaintiffs respond that, like Mr. Smay, Mr. Meagher was constructively discharged only after (1) Mr. Gregor was pressured into reducing the average age of his workforce and was replaced by Mr. Valitchka, (2) SI imposed an inflated sales quota on him during a recessionary year, and unduly criticized his performance, (3) mindful of his medical condition, Mr. Stelter created a "new" job description for district sales managers which included "trumped up" physical requirements, and (4) Mr. Guernsey told Mr. Gregor that Mr. Meagher was an "old incompetent," and instructed him to fire that "old son-of-a-bitch in Florida" and replace him with "young blood." Again, a reasonable jury could conclude that Mr. Meagher was forced to retire as a result of discriminatory conduct on behalf of the defendants; therefore, the defendants' summary judgment request must be denied as to Mr. Meagher.

According to the defendants, Mr. Isferding voluntarily retired because he was unhappy with his transfer to the parts department in a company reorganization at Appleton, despite the fact that he received the same pay as in

his previous position. The plaintiffs respond that Mr. Isferding had always received positive employment reviews, and that he was constructively discharged after being subjected to verbal harassment and adverse treatment by Mr. Quinn based solely on his age and being demoted to the parts department. They also indicate that Mr. Isferding believed that he would soon be fired given company-wide harassment of himself and other older employees. A reasonable factfinder could agree with the plaintiffs that Mr. Isferding was targeted for harassment based on his age, and that the age hostility in his work environment became so unbearable that he felt he had no choice but to retire. For this reason, the defendants' motion must be denied.

The defendants present evidence that Mr. Jones, on his own admission, voluntarily retired because he wished to move to Colorado to be closer to his daughters and to pursue recreational and consulting interests. According to the plaintiffs, Mr. Jones was constructively discharged, despite a long history of satisfactory performance, after being subjected to verbal harassment and adverse treatment by Mr. Quinn based solely on his age. Neither party paints a particularly compelling picture; nevertheless, a jury could reasonably conclude that age hostility in his work environment effectively forced Mr. Jones out of his position. Again, the defendants' request for summary judgment must be denied.

The defendants indicate that Mr. Coxhill voluntarily retired because he was unhappy with his transfer to the new position of Chief Engineer of Product Quality, and then to Field Service Manager, in a company reorganization at Appleton, despite the fact that he received the same pay as in his previous position. The plaintiffs, on the other hand, present evidence that Mr. Coxhill was constructively discharged on the basis of age, despite a history of solid performance, as (1) Mr. Guernsey decided to replace him as Manager of Engineering with Mr. Quinn before he had ever given Mr. Coxhill a performance review (2) when demoting him to the position of Chief Engineer of Product Quality in April of 1991, Mr. Guernsey "suggested"

to him that he consider retirement, and indicated that Mr. Stelter was "standing by" to discuss that option with him (3) he was forced to report to Mr. Quinn, whose abusive behavior toward him and other older employees was well documented, and (4) he feared that he would be fired based on a pattern of age discrimination he observed being imposed on him and other older employees. A reasonable jury may reject the defendants' proffered explanation for Mr. Coxhill's retirement, and conclude that he was forced out of the organization on the basis of his age. The defendants may therefore not meet their burden, and summary judgment is inappropriate.

Finally, as to Mr. Conradt, the defendants indicate that he voluntarily retired after (1) his job responsibilities were reduced and he was reprimanded for several performance deficiencies (2) he and Mr. Guernsey had experienced a conflict in management style, and (3) he had become aware that he would receive an inheritance under his father's will. According to the plaintiffs, however, he was constructively discharged after (1) he had observed a pattern of discriminatory practices against older employees at SI (2) Mr. Guernsey told him that we need to get some young—ah, new blood into the organization (3) he unsuccessfully resisted the age-based termination of Mr. Weiss (4) he concluded that SI management wanted him to participate in "illegal and immoral" employment discrimination policies, and feared personal liability for carrying out such policies, and (5) he feared that he would be fired based on his age. Mr. Conradt testifies that he felt he had not choice but to leave SI, even though he enjoyed his work and wanted to continue his employment. Again, a jury could reasonably conclude that Mr. Conradt was effectively forced out of his position due to age hostility by the defendants, and that the defendants have therefore not met their burden. As a result, the defendants' motion must be denied.

c. *Bifurcation procedure to be used at trial:*

██ In their letter briefs, the plaintiffs in this matter stress that, unlike the plaintiffs in

*Teamsters* and in most pattern or practice cases, their representative class is relatively small. *See, e.g., Forehand,* 839 F.Supp. at 813. As a result, they indicate that

> "every living Plaintiff will testify in the first phase of trial as part of Plaintiffs' evidence of Defendants' pattern or practice of discrimination. In other words, the evidence of discrimination against every Plaintiff in this lawsuit will be part of the Plaintiffs' pattern or practice case."

By adopting this added degree of caution in providing anecdotal evidence of discrimination, the plaintiffs, no doubt, are mindful of the above-referenced admonishment in *King* and *Teamsters,* that plaintiffs highlight the " 'manifest' difference between individual claims of discrimination and a class action alleging a general pattern or practice." *King,* 960 F.2d at 622. *See also Cooper,* 467 U.S. at 876, 104 S.Ct. at 2799–2800; *Forehand,* 839 F.Supp. at 813. Given the relatively small size of the plaintiff class, the plaintiffs' need to present more than "isolated or sporadic discriminatory acts" to meet their *prima facie* case, and our general reluctance to limit the degree of evidence deemed necessary by the plaintiffs to meet their evidentiary burden, the Court shall allow the plaintiffs to call each of the named plaintiffs as witnesses in establishing their *prima facie* case.[7]

■ Because the plaintiffs in this matter intend on having each named plaintiff testify in presenting their *prima facie* case, they suggest that the Court "adjust" the *Teamsters* analytical framework by requiring the defendants to present *all* defense evidence relevant to liability, including non-discriminatory reasons for each plaintiff's termination or constructive discharge, during the liability,

or *prima facie,* stage of trial. According to the plaintiffs,

> "because Defendants will need to tailor their defense to the evidence presented by the Plaintiffs at the liability phase, the only new evidence to be presented by Defendants in the remedial stage will be their damages evidence ... "

In their letter brief to the Court, Defendants argue that a finding as to whether the Plaintiffs were the victims of a pattern or practice of discrimination can only be made in the remedial phase of the trial. However, it makes no sense to wait until after the second phase of the trial to submit questions to the jury regarding evidence submitted in the first phase of the trial. To proceed in that fashion would not only confuse the jury as to what it was to decide and on what evidence, but would also invite the parties to resubmit their evidence and thereby substantially lengthen the time required for trial. Clearly, because all of the liability evidence will be presented in the first phase, efficiency would be enhanced if the jury were asked to decide the existence of the pattern or practice of discrimination and whether Plaintiffs were a victim of that pattern or practice at the end of Phase I of trial."

This procedure, of course, is commonplace in single-plaintiff Title VII cases where discrimination is alleged by only one employee.

While mindful of the differences between this case and *Teamsters,*[8] and cognizant of the intuitive appeal of the approach advanced by the plaintiffs,[9] the Court shall nevertheless institute the *Teamsters* analytical framework in trying this case. We do so for several reasons. First of all, implementation

---

7. This matter is currently scheduled for a six-week trial; because the Court may limit both the time used by the plaintiffs to prove their *prima facie* case and the introduction of duplicative evidence, the plaintiffs, of course, may be required to adjust their *prima facie* presentation, including limiting the number of plaintiffs called to present anecdotal evidence, accordingly.

8. The Court recognizes that pattern or practice cases do not always fit comfortably into the standard proof sequences. *See, e.g., Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866; *Segar,* 738 F.2d at 1267 n. 12; *Craik,* 731 F.2d at 470 n. 7.

9. The plaintiffs correctly note that, should we adopt the *Teamsters* approach and the jury finds at the end of the *prima facie* stage of trial that the defendants engaged in a pattern or practice of age discrimination, then trial efficiency may be lost by allowing the defendants to potentially "reserve" justification arguments for the second phase of trial; however, it is by no means certain that the defendants will withhold such arguments, and the Court nevertheless intends on honoring its promise to the parties that duplicative testimony will be kept at a minimum.

of the plaintiffs' approach may unduly prejudice the defendants by unnecessarily lengthening the number of days spent in trial. A significant component of the *Teamsters* framework is potential cost-savings in defending a pattern or practice charge; the employer assesses the strength of the plaintiffs' *prima facie* proof, produces the volume and strength of rebuttal evidence it deems necessary to defeat that charge (which, as previously indicated, often does *not* include giving non-discriminatory reasons for employment decisions regarding testifying plaintiffs), and gets a jury determination as whether the plaintiffs have met their *prima facie* case. Requiring the defendants to use all of their ammunition during the first phase of trial, including giving nondiscriminatory explanations for adverse employment decisions, eradicates this cost-containment strategy established in *Teamsters*, and may unnecessarily lengthen the first stage of trial if the plaintiffs' *prima facie* proof is ultimately rejected by the jury. Secondly, should the jury find that the plaintiffs failed to prove their *prima facie* case, the plaintiffs may nevertheless be entitled to pursue individual discrimination claims under the *McDonnell Douglas* format in separate jury trials for each business unit; under such circumstances, the defendants would be forced to defend themselves against the same discrimination charges twice in three different lawsuits. Again, adoption of the traditional *Teamsters* format may eliminate otherwise-unnecessary litigation costs in the first stage of proceedings without compromising the plaintiffs' right to bring individual claims, and seems more fair to the defendants. Finally, the defendants raise justifiable concerns regarding undue complication of the special verdict form to be issued to the jury.

The Court, then, shall adopt the traditional *Teamsters* model in conducting proceedings in this case. The defendants will be permitted to rebut the plaintiffs' *prima facie* proof during the liability phase with any evidence they deem necessary to establish the absence of a company-wide policy of age discrimination. They need not, however, "lay all their cards on the table" as to justifications for the termination or constructive discharge of testifying plaintiffs if they believe that such evidence is not necessary to defeat the plaintiffs' *prima facie* case. Should the jury determine that the plaintiffs have not met their burden of establishing a *prima facie* case of discrimination, then the defendants may, in fact, have preserved resources and costs accruing to the litigants and the Court in these proceedings, although they may be required to expend those resources in subsequent individual discrimination actions.

If, on the other hand, the jury finds that the plaintiffs have met their *prima facie* case, then the defendants may introduce appropriate defenses not presented in the liability phase to meet their burden of proving non-discriminatory terminations regarding each plaintiff in the remedial stage of proceedings. This may include justifications for the termination of particular plaintiffs, and may require the defendants to recall certain witnesses to the stand for further testimony. Because the same jury will decide these issues, neither the defendants nor the plaintiffs will be permitted to elicit duplicative testimony or reintroduce evidence already presented during the first stage of proceedings. This will ensure that the trial proceeds in an efficient and orderly fashion.

2. *Individual discrimination claims:*

■ The Court shall defer ruling on the defendants' Motion for Summary Judgment as to the plaintiffs' individual discrimination claims until after completion of the liability, or *prima facie*, phase of trial. If the jury finds that the defendants engaged in a pattern or practice of age discrimination, then the plaintiffs would be entitled to the burden-shifting presumption of *Teamsters* which, unlike the *McDonnell Douglas* format in individual discrimination cases, obligates the *defendants* to prove by a preponderance of the evidence that age discrimination was not a "but for" cause, or determining factor, in any particular employment decision. *Xerox*, 850 F.Supp. at 1082. Presumably, because the burden of persuasion may shift to the defendants under the *Teamsters* approach, but not under the *McDonnell Douglas* format, a finding of pattern or practice discrimination obviates the need to separately pursue individual discrimination claims. *See Coates*, 756 F.2d at 533. Should the jury, however, determine

that the defendants did not engage in a pattern or practice of age discrimination, we previously saw that the plaintiffs may pursue individual discrimination claims in subsequent proceedings before two different juries; under these circumstances, the defendants' motion as to individual discrimination claims would require Court resolution under the *McDonnell Douglas* format. Until completion of the liability stage of trial, then, the defendants' Motion for Summary Judgment as to individual discrimination claims brought by the plaintiffs is premature; as a result, the Court will not address it at this time, and will consider it in subsequent proceedings only if required to do so pursuant to the jury's determination in the liability phase of the pattern or practice trial and at the request of either party.

## IV. SUMMARY

For the foregoing reasons, **IT IS HEREBY ORDERED** that the defendants' Motions for Summary Judgment as to (1) the Age Discrimination Claim of Plaintiff Robert Van Dyke (2) the Age Discrimination Claims of Plaintiffs Ronald Weiss, Malcolm Flavel and Richard Spoonamore, and (3) those Plaintiffs Alleging Constructive Discharge—Byron Smay, William Meagher, Robert Isferding, Robert Jones, Major Coxhill, and James Conradt be **DENIED** in the above-captioned matter.

**SO ORDERED.**